## JIM GROSS v. THE STATE.

### No. 581.   Decided February 8, 1911.

**1.—Incest—Evidence—Other Acts of Intercourse.**

Upon trial of incest, testimony of other and subsequent acts of intercourse than the one upon which the prosecution relied are inadmissible, and testimony that defendant ordered his daughter to get in bed with him was inadmissible, and this although no actual intercourse was shown.   Following Skidmore v. State, 57 Texas Crim. Rep., 497, and other cases.

**2.—Same—Evidence—Contradicting Witness.**

Where, upon trial of incest, testimony got into the case with reference to a statement of the prosecutrix that her three uncles had been having intercourse with her, and prosecutrix denied this on the witness stand, the defendant should have been allowed to contradict her statement by other witnesses.

**3.—Same—Impeaching Witness—Evidence.**

Where, upon trial of incest, the prosecutrix testified that she had never been out in public with any young man except when some one else was with her, the defendant should have been allowed to contradict and impeach the witness on this line of testimony.

**4.—Same—Evidence—Impeaching Witness.**

Where, upon trial of incest, the prosecutrix denied a certain incident which occurred between her and the witness, and had also testified that she was not intimate with a certain party whom she afterwards married, the defendant should have been allowed to contradict her testimony

**5.—Same—Evidence—Declaration of Third Parties.**

Upon trial of incest, testimony as to a conversation between the witness and the mother of prosecutrix, in the absence of the defendant, and not connected with the prosecution, was inadmissible.

**6.—Same—Evidence—Letter—Husband and Wife—Attorney and Client—Privileged Communications.**

Upon trial of incest, it was reversible error to admit in evidence the contents of a letter which the defendant had written to his wife wherein he implored her to get his daughter and husband out of the way, as they could put him to death; and this although the letter came into possession of State's witness by accident and without connivance of the wife, as the same was a privileged communication between husband and wife.   See opinion for discussion of relations between husband and wife, and attorney and client.   Following Cole v. State, 48 Texas Crim. Rep., 439, and other cases.

**7.—Same—Recalling Jury—Additional Charges.**

Where the judgment was reversed upon other grounds, it is unnecessary to pass upon the question of recalling the jury and giving additional charges.

Appeal from the District Court of Ellis.   Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of incest; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Will P. Hancock*, for appellant.—On question of other acts of intercourse:   Thornley v. State, 36 Texas Crim. Rep., 118; Wilson v. State, 37 Texas Crim. Rep., 373.

On question of introducing in evidence letter of husband to wife: Hearne v. State, 97 S. W. Rep., 1050; Mercer v. State, 74 Am. St. Rep., 135; Crow v. State, 72 S. W. Rep., 392, and cases cited in the opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.—On the question of letter between husband and wife: Gant v. State, 55 Texas Crim. Rep., 284, 116 S. W. Rep., 801; 10 Ency. of Ev., 194; Com. v. Everson, 96 S. W. Rep., 460; Buffington v. State, 20 Kas., 599; State v. Ulrich, 19 S. W. Rep., 656.

DAVIDSON, PRESIDING JUDGE.—Appellant was charged with and convicted of incest with his daughter Maud.

The evidence shows that appellant had been a resident of Ellis County something like thirty years, residing on a farm near Maypearl in that county. His daughter Maud was a girl about fifteen years of age, weighed about 200 pounds. The family consisted of appellant, his wife, three daughters, and two boys, Maud being the oldest child. Appellant and his wife were members of the church in that community, and the family up to this transaction seemed to have been highly respected. The relations between appellant and his wife until the disagreement arose over the alleged conduct of the prosecutrix and appellant were pleasant. During the year 1908 a young man by the name of Emory Burns, about twenty-eight years of age, began working for appellant as a farm hand, and lived in the house with the family. Shortly after his appearance upon the scene he and prosecutrix became sweethearts and wanted to marry, to which appellant interposed objection. The mother decided with the girl. It seems that Burns was a young man without means or ability to support a wife. The opposition of appellant to this marriage brought about trouble between appellant and his wife which finally resulted in this prosecution. Appellant told his wife of improper relations he had discovered between Burns and his daughter Maud, and he charged the girl with this course of conduct with Burns in the presence of and to his wife. Maud denounced this as "a lie," and said she "would get even with" appellant. Subsequently, appellant was informed by his wife that Maud had told her that he, appellant, had had intercourse with her, the prosecutrix; thereupon appellant called her in and asked her "what in the name of God" she meant by charging him with such an offense. She made no reply, and appellant further stated: "I see now what you meant when you said you would get even with me," and further stated, "You know it is not so, for you have charged me with the same thing that you charged against your three uncles, John, Richard and Earl Coleman, with having intercourse with you." A reconciliation of the trouble in the family was partially brought about. Prosecutrix and

Burns were married at home and began living near appellant and his family. Neighbors who were related to appellant's wife began interfering in their affairs. Appellant left home and was away for a short time and returned. He again went away, and during his absence the bill of indictment was found. There was quite a mass of testimony admitted, most of it over objection of appellant, showing the course of conduct of appellant towards his daughter as detailed by her both before and after the alleged act of intercourse, which was relied upon by the State as having occurred on the 15th of December, 1908. Some of these acts and matters occurred subsequently to that date. This is, we think, a sufficient statement of the case.

1. We deem it unnecessary to discuss all the bills of exception. Bill No. 7 recites the following question asked by the county attorney: "I will ask you to state whether or not your father ever made or had your mother to leave the room and call you and made you come over and get in bed with him?" She answered in the affirmative, and that this happened in January, 1909, subsequent to the alleged act of intercourse on the 15th of the previous December. The substance of the qualification, as we understand, to the bill is that this matter was permitted to be shown, but the county attorney was not permitted to show the act of intercourse. This testimony was inadmissible. The authorities, we think, in this State are all clear that acts of this kind in cases of this character, occurring after the act of intercourse relied upon for conviction, are inadmissible. And it is not changed by the fact that the witness was not permitted to testify to the actual intercourse. That fact was excluded. There are other bills of exception practically to the same effect. The acts between the parties occurring after that relied upon can not be admitted in evidence when objection is urged. Smith v. State, 44 Texas Crim. Rep., 137; Ball v. State, 44 Texas Crim. Rep., 489; Barnett v. State, 44 Texas Crim. Rep., 592; Henard v. State, 46 Texas Crim. Rep., 90; Hackney v. State, 7 Texas Ct. Rep., 890; Wiggins v. State, 47 Texas Crim. Rep., 538; Stripling v. State, 47 Texas Crim. Rep., 117; Roberts v. State, 51 Texas Crim. Rep., 27; Smith v. State, 52 Texas Crim. Rep., 80; Pridemore v. State, 59 Texas Crim. Rep., 563, 129 S. W. Rep., 1112; Skidmore v. State, 57 Texas Crim. Rep., 497. The Barnett case, supra, overrules Hamilton v. State, 36 Texas Crim. Rep., 372; Manning v. State, 43 Texas Crim. Rep., 302, and Cooksey v. State, 58 S. W. Rep., 103. We deem it unnecessary to pursue this thought further, nor review each separate exception reserved. Upon another trial this character of evidence will not be permitted to go to the jury.

2. There was a statement of the prosecutrix that her three uncles had been having intercourse with her introduced in evidence and became interwoven with the trial of the case. While prosecutrix was upon the stand she denied making these statements. Having denied this, witnesses were placed upon the stand to contradict her

and show that she had made the statement. On objection of the county attorney this was excluded. Various reasons were offered why this testimony was admissible, among others, that it was impeachment, that her testimony was unreliable, that she was in the habit of charging her relatives with this course of conduct with her. Without discussing whether or not this testimony as an original proposition was admissible for the purpose of attacking her evidence and showing her ill will and matters of that sort towards her father for interfering with her proposed marriage with Burns, yet it having gotten into the case, the defendant had the right to probe it as far as he could for what it was worth in attacking her testimony, and in aiding his view of the case that her whole story was fabricated, and it was done because of the fact that he had interfered, in the first instance, with her proposed marriage and to explain as best he could her threat to get even with him, and to show that her testimony was unreliable. If this matter should get into another trial this testimony should be admitted.

3. The prosecutrix testified, among other things, that she had never been out in public with any young man unless her sister or someone else accompanied her, and especially that she had not been with Burns, whom she subsequently married, under such circumstances. To contradict and impeach her on this line appellant offered testimony from several witnesses that they had seen her going to and in the town of Waxahachie with Burns when her sister was not with them. In fact, that she had been seen going to the town and with him in the town without anyone in company with them. She had also testified that her father was very rigid with her and would not let her be with Burns anywhere alone, even on the premises where they lived. As before stated, appellant offered evidence to show that she and Burns were together in Waxahachie and were seen going there. This was excluded on objection by the county attorney. In view of the condition of this phase of the case, this testimony was admissible. Illustrative of this, one of the bills of exception recites that R. W. Hopkins was tendered as a witness, and by him it was offered to be proved that he had seen Emory Burns and prosecutrix on two separate occasions at a late hour of the night at Waxahachie at the chautauqua in the summer of 1908. The court excluded this testimony upon the ground that it was an attempted impeachment upon an immaterial matter. The State seemed to think that it was of some value to show that she was not alone with Burns at any time, and having introduced it, appellant certainly had the right to offset whatever effect it might have upon the jury by any available testimony which contradicted her statement. Her father had charged her, in the presence of his wife, mother of prosecutrix, with having had intercourse with Burns; that he caught them in the act, and this brought from her the statement that she would get even with him. We are of opinion that this testimony, in the

180 61 TEXAS CRIMINAL REPORTS. [*February*,

attitude in which it is presented in the record, was of considerable import.

4. It was also proposed to be shown by Hopkins that he remembered having a conversation with Maud Gross at the home of her father in the summer of 1908, in which he was teasing her and in which she told him that he, witness, could do nothing with her; that she "only done business with Emory Burns, and that it was all his and no one could do anything to her." Witness was playing the violin, and she and witness had been playing the violin and organ together; they played a few pieces, and the neck of her dress was open and that left her breast exposed; that after playing a few pieces he took his violin bow and run down the neck of her dress and touched one of her breasts, and she turned around on the organ stool and said, "Nothing doing for you; that was promised to Mr. Burns; belonged to Mr. Burns and no other." This was offered by appellant to show the relation between prosecutrix and Burns, whom she subsequently married, and to show her character generally, and also for the purpose of contradicting and impeaching her testimony in which she denied intimacy with Burns and all other persons except the defendant. She denied this incident related by Hopkins. We think, in view of what has been stated in regard to the prosecutrix, and what had occurred between them, that this testimony was admissible.

5. Oll Bruce testified for the State in rebuttal, and while so testifying, the following question was asked by counsel for the State: "Calling your attention to the conversation that you had, if any, with Mrs. Gross about her leaving her husband, I will ask you to just explain that conversation, what you stated to her; just tell the jury what you said to her; don't say what she said, but what you said." Witness answered: "After defendant left home I told Mrs. Gross it looked to me like there was but one thing for her to do and that was to go to her father. I said you can not stay here alone, and I have got all that I can do; I can not stay with you. That is the substance of what I told defendant's wife." Objection was urged to the question and answer because the testimony is not admissible upon the ground that such conversation between the wife of the defendant and the witness or any explanation that was made by him to the wife when the defendant was not present was inadmissible, and the testimony of the witness shows that the defendant was not present when he says he had the conversation with Mrs. Gross. At the time the objection was made the court made the following statement. "The defendant's counsel in cross-examination of other witnesses sought to show conspiracy between this witness and the wife of defendant and other members of the family to show that he advised separation after the charges made against the defendant, and this testimony was permitted to go to the jury as explanatory of this witness' connection with the matter." We are of opinion this

testimony was not admissible. The State could meet, as a matter of course by legitimate testimony, any attempt on the part of the family of the wife of defendant and witness with other members of the family if the defendant had introduced this character of testimony, but the State could not introduce matters occurring between Oll Bruce, the brother of Mrs. Gross, and defendant's wife. She was the wife of defendant and this evidence would tend to show after a prolonged conversation between her brother and sister his conclusion of these matters, and it authorized the giving of his opinion in the concrete that on account of these matters the separation had occurred. Appellant was not a party to it . It was in his absence, and could not affect the question legitimately which was before the jury, to wit: the intercourse between appellant and his daughter. This whole thng was the act of third parties among themselves, and was, we think, necessarily damaging. Upon another trial this testimony should not be permitted to go to the jury.

6. Another bill of exceptions recites that the State placed upon the stand Mrs. Maud Coleman, who stated that she lived at Miles, in Runnels County; was the mother of Mrs. Jim, or Eva, Gross, the wife of defendant, and that Mrs. Jim Gross and her children had been living at her home since the defendant got into this trouble. She further testified that she was acquainted with the handwriting of defendant and knew it when she saw it, and further, while defendant was at Putnam, Texas, he wrote a letter to his wife, Mrs Jim Gross, and that she, witness, read the letter; that she "was prowling in to see what was going on between them in the way of correspondence," and through curiosity she got hold of this letter and read it. She further testified that she just picked up this letter in the house; that it was her home, but did not know why Mrs. Jim Gross, wife of defendant, did not give this letter to her, nor did she do anything to direct her attention to this particular letter, and this letter that defendant sent to his wife from Putnam, Texas, was burned up as she saw her daughter, Mrs. Jim Gross, put this letter in the stove; and that she knew the contents of this letter from defendant to his wife, it being the same letter that she saw Mrs. Jim Gross burn. That she was not hunting evidence against defendant, as he had not at that time been arrested, and she hoped the matter would never get out. The State then proposed to prove by the witness, Mrs. Maud Coleman, the contents of the letter, to which the defendant objected for the following reasons: The letter was a privileged communication between defendant and his wife; that the testimony shows that the witness, Mrs. Maud Coleman, was looking for letters and that she found this particular letter in her home; that she was searching for letters from defendant to his wife, and further, the letter was not admissible, nor is it admissible for the witness to state the contents as to what was in said letter; that it is making and using the wife as a witness against the defendant, her husband, indirectly by

using a privileged communication between them as husband and wife. These objections were all overruled, and witness testified that in said letter, being the same letter that wife of appellant burned, he wrote his wife the following: "For God's sake, get Emory and Maud Burns out of the way, for they could put me to death; you ought to do that much for me." The court says this testimony was admitted on the theory that if the communication had been verbally made by defendant to his wife, and had been overheard by Mrs. Coleman she could have testified to it, and it being made in a letter which came into Mrs. Coleman's hands without any act on the wife's part in aid thereof, the contents thereof could likewise be shown by the witness. There is a broad distinction between the introduction of conversations overheard by third parties occurring between husband and wife and the introduction of letters written by one to the other, as shown by practically, if not all, the authorities. It is unnecessary to take up or discuss the question as to conversations going on between husband and wife which are overheard by other parties. That question is not in the case and it is unnecessary to discuss it. We hold that the introduction of the contents of the letter through the witness Mrs. Maud Coleman was inadmissible. It was a privileged communication under the statute, and, therefore, interdicted. Article 774, Code of Criminal Procedure. That statute says: "Neither husband nor wife shall in any case testify as to communications made by one to the other while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation subsisted, except in a case where one or the other is prosecuted for an offense, and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial."

In the case of Hearne v. State, 50 Texas Crim. Rep., 431, 97 S. W. Rep., 1050, the court permitted the introduction in evidence of ten or twelve letters alleged to have been written subsequent to the marriage of appellant with C. Wilson, which letters were written by appellant to her. The letters were admitted without objection on the part of appellant. Subsequently, appellant moved to exclude the same from the consideration of the jury on the ground that they were privileged communications by the husband to the wife. The State relied upon Crow v. State, 72 S. W. Rep., 392, to sustain the insistence that the letters were admissible. The court said, in substance, that the objection urged in the Crow case was not that they were privileged communications, but that the testimony is remote. In the Hearne case, 50 Texas Crim. Rep., 431, the letters were held inadmissible, and the court further said: "Letters of the wife to the husband or husband to the wife are not admissible evidence in a prosecution for bigamy. We will not mention these letters seriatim, but hold that upon another trial none of the letters should be intro-

duced that come within this rule." The judgment in that case was reversed on account of the admission of the letters. The same rule has been laid down in Cole v. State, 48 Texas Crim. Rep., 439; Burke v. State, 15 Texas Crim. App., 156; Davis v. State, 45 Texas Crim. Rep., 292; Gant v. State, 55 Texas Crim. Rep., 284. In the latter case the court said: "The privilege extends beyond dissolution of marriage relation by death or divorce. Ency. of Ev., pp. 196, 197; note 43 for collation of authorities. It includes letters from one spouse to the other." Mitchell v. Mitchell, 80 Texas, 101; Mercer v. State, 40 Fla., 216; Midland Lumber Co. v. Kreeger, 52 Mo. App., 418; Com. v. Sapp, 29 Am. St. Rep., 415; Stein v. Bowman, 13 Peters, 209; Saunders v. Hendrix, 5 Ala., 224; 1 Greenlf. on Ev., secs. 254, 337, 338 and notes; Cook v. Grange, 18 Ohio, 526; Brown v. Wood, 121 Mass., 137; Maynard v. Vinton, 59 Mich., 139; Jacobs v. Hesler, 113 Mass., 157; Hitchcock v. Moore, 70 Mich., 112; Smith v. Potter, 27 Vt., 304; Brock v. Brock, 9 Atl. Rep., 486. The above list of cases is cited in Gants' case, supra.

In the Mercer case, supra, which is also found reported in the Am. St. Rep., vol. 74, p. 135, it is shown that Mercer was charged jointly with Wesley Bush for wilfully driving an ox upon the railroad track, and were jointly tried and convicted, each being sentenced to ten years in the penitentiary. The court in that case, passing upon the question of the admissibility of letters from husband and wife, uses this language: "Such confidential communications between husband and wife have always been regarded as privileged, and when attempted to be detailed or developed by either of the parties to whom the communication has been entrusted the law not only forbids, but will not permit it to be done. Society has a deeply rooted interest in the preservation of the peace of families and in the maintenance of the sacred institutions of marriage and its strongest safeguard is to preserve with jealous care any violation of those hallowed confidences inherent in and inseparable from the marital status. As Mr. Greenleaf puts it: 'The great object of the world is to secure domestic happiness by placing the protecting seal of the law upon the confidential communications between husband and wife and whatever has come to the knowledge of either by means of the hallowed confidence which that relation inspires can not be afterwards developed in testimony, even though the other party be no longer living.' " First Greenleaf on Evidence, 15th ed., secs. 254, 334, 337; 2nd Taylor on Evidence, secs. 908 and 910. The court further says: "That the letter from the husband to the wife was not sought to be introduced directly through the wife as a witness to whom it had been written, but in some way not disclosed by the rocord, had found its way into the possession of the attorneys for the defendant and its offer in evidence was from their immediate custody. There is a considerable array of authorities to the effect that when confidential communications between husband and wife get out of the possession

and control of the parties to the confidence and find their way into the possession and control of third persons, regardless of the manner in which the possession thereof may be obtained by such third person, that then communications lose their protected privileges of the law and become competent and admissible. We can not agree to the correctness of this rule thus broadly laid down by these and other authorities, but think the policy of the law that forms the foundation of the general rule is far more strongly upheld and subserved by those authorities that recognize and declare certain class of communications to be privileged from the inherent character of the communication itself, and that in such cases the privilege attaches to the communication itself and protects it from exposure in evidence wheresoever or in whosesoever hands it may be."

In Scott v. Commonwealth, 23 S. W. Rep., 219, Judge Lewis, rendering the opinion for the Court of Appeals of Kentucky, uses this language: "For it is essential to the happiness of social life that the confidence existing between husband and wife should be sacredly protected and cherished in its most unlimited extent, and to break down and impair great principles which protect the sanctity of that relation would be to destroy the best solaces of human existence.

"The evidence in this case shows that the letter in question was procured from appellant's wife by a brother of the deceased and thus came into the possession of the Commonwealth's attorney, but it seems to us whether given up by her voluntarily or obtained against her will, it was a disclosure of what had been written by her husband in the privacy and confidence of the marital relation and the use of it against the husband in this case was just as much against the policy of the law because as fully within the reason of it as would have been a disclosure of what he had said to her in the confidence and privacy of the marriage relation," citing Selden v. State, 74 Wis., 271, 42 N. W. Rep., 218.

42 N. W., 218, was a prosecution of a party for perjury who in the proceedings against his wife for divorce made affidavit that he did not know her place of residence and the question on the trial was whether letters written by him to her pending proceedings for divorce showing he did know her place of residence and which she had placed in the possession of her attorneys, were competent evidence against him in a criminal trial. Applying the rule mentioned, it was here held that the letters being confidential communications, not even the address on the envelopes could be used as evidence against the husband.

These authorities, we think, are sufficient to show that the ruling of the trial court was error, and we deem it unnecessary to discuss this question further, or add any remarks to those already quoted. The reasons are sufficiently stated in fully appropriate language.

In the case of Liggett v. Glenn, 51 Fed. Rep., 381, the court was

passing upon privileged communications between attorney and client, and uses very much the same reasoning as the cases cited do with reference to marital relation. Our statute, article 773, of the Code of Criminal Procedure, in regard to privileged communications between attorney and client, is as follows:

"All persons except those enumerated in articles 768 and 775, whatever may be the relationship between the defendant and witness, are competent to testify, except that an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship."

This statute declares the law in our own State in regard to privileged communications between client and attorney. The two statutes are quite similar and have been rigorously upheld. In Liggett v. Glenn, supra, Judge Shiras, delivering the opinion of the court, said:

"The admissibility of the communications, in our judgment, is not dependent upon the manner in which control thereof is obtained from the counsel, but upon the inherent character of the communication itself. If the admission or statement sought to be put in evidence was made by reason of the confidential relation existing between client and counsel, it becomes a privileged communication, and as such it is not competent evidence against the client. Its competency is not dependent upon the mere manner in which knowledge thereof may be obtained from counsel. The principle forbidding its use is not adopted as a mere rule of professional conduct on part of the attorney. It confers a right upon the client for his protection and advantage, and which he alone is authorized to waive. It will not do to hold that the communication loses its confidential and privileged character if knowledge thereof can be obtained by means which do not involve the counsel in a breach of professional duty. For illustration, a letter is written by a client to his attorney containing statements of a privileged nature. The counsel, having this letter on his person, meets with an accident, causing his death. Third parties in this way become possessed of the letter, and from them it passes to the possession of the adversary party. Has this letter lost its privileged character and become competent evidence against the writer, simply because it passed from the possession of his counsel, to whom it was written, without fault on part of the attorney? Suppose that, upon a trial of a cause, an attorney is sworn as a witness, and he is asked to produce a letter written him by his client. He refuses, on the ground that it is a confidential communication. The trial court overrules the objection, and compels the production of the letter, which is filed as part of the evidence in the case. An Appellate Court reverses the ruling of the trial court on this question, holding that the letter was privileged, and sends the case back for a new trial. On the second hearing, the

attorney is not called as a witness, but the clerk, in whose custody the letter was placed on the first trial, is summoned by a subpoena duces tecum, and required to produce the letter in order that the same may be read in evidence. Is it possible that this letter, being a confidential communication between client and counsel, can be rightfully put in evidence upon the theory that the possession thereof was obtained without fault on part of the attorney?

"The argument, founded upon the assumption that the admissibility of confidential communications between client and counsel is dependent solely upon considerations of the duty of counsel not to make known that which was communicated to him professionally, is, in our judgment, faulty, in that it ignores the main purpose of the rule, which is that the client shall be at liberty to freely communicate to his attorney knowledge of all matters connected with the business in hand upon the assurance that confidential communications thus made are privileged and can not be used in evidence against him, unless he deprives them of their privileged character."

It is unnecessary to quote further from the opinion of Judge Shiras. It does settle the question and is in harmony with all the authorities so far as we are aware, to the effect that privileged communications between counsel and client can not be used as evidence directly, nor will its use be permitted in any indirect or surreptitious manner. The communication in any event is privileged. If this is true, as to the relation of attorney and client, how much stronger the reasoning when privileged communications arise between husband and wife. Not minimizing the same relation of client and attorney, but we do say that the relation between husband and wife is far more sacred and to be the more strongly guarded than that of relation between attorney and client. Our statute interdicts the use of testimony in both instances. It makes no difference in this case that Mrs. Maud Coleman obtained the possession of the letter in the manner that she did, that possession and her knowledge of the contents of the letter did not rob it of its confidential and privileged character. If obtaining the letter by Mrs. Coleman, as she states, and her statement of its contents could be used, the wife could turn over the letter to State's counsel, and thereby constitute it admissible evidence. To hold this would be to, in effect, abrogate the statute and break down the purpose of the law, which was to shield and protect the privileged matters occurring between husband and wife. Not only does this privilege exist during the lifetime, but it passes beyond the life of either or both, and becomes a permanent and fixed fact for all time, whether this relation ceases to exist by divorce or death.

7. There is complaint made of the manner in which an additional charge was given to the jury after they had retired to consider their verdict. This will not occur upon another trial, and it is unnecessary to discuss it.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[No motion for rehearing filed March 16, 1911.—Reporter.]