## J. DROZDA v. THE STATE.

### No. 5669. Decided February 11, 1920.

**1.—Libel—Information—Foreign Language—Translation Into English.**

Where, upon trial of criminal libel, the alleged defamatory article was published in defendant's paper in the Bohemian language and as such copied in the information, a substantially correct translation thereof into the English language, should have accompanied the same. Following: Dunn v. State, 43 Texas Crim. Rep., 25, and other cases, and this in turn should have been followed by another translation in English to make clear the meaning of said article by explanatory or *innuendo* averments.

**2.—Same—Libel—Translation—Information—Innuendo—Pleading.**

Where, upon trial of criminal libel, the alleged libelous article was printed in the Bohemian language and was set out in the information, followed by a translation which was numerously interspersed and mingled with *innuendo* averments, none of which appear in the original, and it was manifest that what purported to be a translation was not in fact either a literal translation or even a substantial translation thereof, the information was insufficient.

**3.—Same—Libel—Indefinite Character—Innuendo—Pleading—Persons Libeled.**

The purpose of the libel law is to punish him who maliciously imputes to others in writing, etc., disgraceful conduct, etc., and unless there be that in the alleged libelous publication *per se* which would tend to indicate the person or persons aimed at, or meant to be attacked, it is difficult to conceived how *innuendo* could impart to the language used, the specific personal criminal intent necessary.

**4.—Same—Case Stated—Innuendo—Pleading—Injured Parties.**

Where, upon trial of libel, the explanatory averments did not show how the language used in the alleged libelous article relates to the alleged injured parties, and did not explain but merely asserted by *innuendo* facts not suggested by the publication in any way, instead of more precisely fixing the meaning, the information was insufficient on motion to quash. Following: Potter v. State, 216 S. W. Rep., 886.

**5.—Same—Rule Stated—Libel—Pleading—Information—Innuendo.**

The office of an *innuendo* is to define the defamatory meaning which the party seeks to put upon the words complained of, to show how they came to have the particular meaning claimed for them, as well as to show how they relate to plaintiff, whenever that is not clear from the face of the words, but an *innuendo* must not introduce new matter, or enlarge the meaning of words. Following: Atchley v. State, 56 Texas Crim. Rep., 569.

Appeal from the County Court of McLennan. Tried below before the Hon. James P. Alexander, judge.

Appeal from a conviction of criminal libel; penalty, a fine of $100.

The following statement taken from appellant's brief is substantially correct:—

The libelous matter, set up in the information, was published in the Bohemian language and a translation is attempted to be made into the English, together with *innuendoes* added by the pleader, as follows:

"Those people which you call leaders have recognized the C N S (Meaning the Bohemian National Alliance) only after our people began more liberally with their donations. They (meaning M. Pazdral, F. G. Kupec, C. H. Chernosky, J. E. Krizan, J. J. Frnka, J. R. Kubena, Joseph Tapal, Otto Stehlik, J. K. Vilt, Joseph Wandrash, Jos. Kruntinsky, Ed. Boehm, S. L. Kostoryz, Jos. Dusek, Sr., H. Zdaril, Jos. Bunata, Jos. Farek, J. Drozd, E. Bazant, Ben Wanzura, Aug. Morris, Rob't. Cervenka, Rud. Kolar, R. J. Marak, Jos. F. Urnanovsky, and Paul S. Skrabanek, and each of them) are not the leaders of the people, but very common profiteers. Because Vojta Benes has authorized them (meaning the aforesaid parties set out in the parenthesis above, and each of them) to collect the gifts they (meaning the aforesaid parties, set out in the parenthesis above, and each of them) they held out of your donations nearly $5,000 and now they are making pleasure trips through the State at $7.50 per day and traveling expenses which is paid out of your gifts (meaning that the aforesaid parties set out in the parenthesis above, and each of them, had misappropriated out of the subscriptions of various and sundry parties contributing to a fund held in trust by the aforesaid parties set out in the parenthesis above, and each of them, the sum of nearly $5,000 and that said parties holding such trust fund and each of them were still misapplying said funds to their own use in making pleasure trips through the State and appropriating to their own use the sum of $7.50 per day out of such fund held by them) they have kept in reserve $1500. so they wouldn't run short (meaning that the aforesaid parties set out in the parenthesis above and each of them) were keeping a part of the trust fund so held by them in reserve to the amount of $1500 that they might so appropriate it to their own use and to the use of each of them). I have done more for the bazaar than the whole bunch (referring to the aforesaid parties set out in the parenthesis above, and each of them) together and besides I gave over $500 cash out of my pocket. You think that I ought to keep silent after knowing that I have supported such a villany? If any one managed a private property like they (meaning the aforesaid parties set out in the parenthesis above) did the gifts of charity from the people, he would be put behind the bars."

The language actually contained in the alleged published article was in the Bohemian language and without *innuendoes* when translated into the English language is as follows:

"Those people whom you style your "leaders," have come to know the C N S only then, when our people began to contribute their donations more generously. They are not, madam, the leaders of a people but are the most common profiteers. Since Vojta Benes has authorized them to receive donations, they have kept (retained) for themselves from your collections almost $5000 dollars, and now they are traveling over the State at $7.50 per diem and traveling expenses, which also is met from your contributions. They have retained in reserve $1500 dollars, so that they would not come short. Madam, I have done for the Bazaar more work than all this bunch put together, and to it I have added from my own pocket over $500. Do you think I should be silent when I have come to know that I had thereby aided only rascality? If any one should have managed private property as they have managed gifts of love of the people, he would have been sent for a number of years behind the bars."

*Pat M. Neff, Thomas B. Lewis,* for appellant.—Cited: Squyres v. State, 39 Texas Crim. Rep., 96, and cases cited in opinion.

*Alvin M. Owsley,* Assistant Attorney General, for the State.— Cited: Mankins v. State, 41 Texas Crim. Rep., 662; Lockhard v. State, 43 id., 61; Gonzales v. State, 58 id., 141; Jones v. State, 38 id., 364; Smith v. State, 39 id., 320.

LATTIMORE, Judge.—This appellant brings before us for review, a conviction in the County Court of McLennan County, for the offense of libel.

Reviewing the various errors complained of, we first note that it is urged that the information is insufficient, because the same does not contain a translation into English of the alleged libelous article. The defamatory article which appeared in appellant's paper, was printed and published in the Bohemian language, and while said information sets out said article, *in haec verba,* as printed in said foreign language, it nowhere sets out the English translation thereof. Examining said complaint and information, we are constrained to agree with this contention. Said pleading set out the article fully, as it is supposed to have been printed, in Bohemian; immediately following which, occur these words: "which said malicious statement is in the Bohemian language, and which translated from the Bohemian language to the English language, *is to the tenor as follows;*" and then follows an English translation of said article which, to our minds, is numerously interspersed and mingled with *innuendo* averments, none of which appear in the original, and which this court can know to be *innuendo* averments only from the frequent parentheses used, and the further use of many names in the translation which do not appear in the original. It is manifest

that what purports to be a translation of the Bohemian article, *"to the tenor as follows,"* is in fact not a literal translation, or even a substantial translation thereof.

We are next confronted with the question as to whether a libelous article, published in a foreign language, and as such copied into an information or indictment, must be accompanied by a substantially correct translation thereof into English. Let us first here note the well known rule in our practice that the alleged libelous matter must be set out *in haec verba*, when possible. Coulson v. State, 16, Texas Crim. App., 196; Edgerton v. State, 70 S. W. Rep., 90.

In 25 Cyc. page 378, discussing indictments for libel and slander, is is said: "Words spoken in a foreign language should be set out in such language, and followed by a proper translation."

In Sec. 564, of Mr. Bishop's New Criminal Procedure, Vol. 2, under the head of "Alleging words from a foreign language," that distinguished author says: "The tenor—is set out by giving an exact copy in the original, and adding an English translation."

In Stichtd v. State, 25 Texas Crim. App., 420, the case turned upon the question if a slander be pleaded in the information only in English, whether same could be supported by proof of a slander uttered in German? This Court answered in the negative, and quotes with approval the rule in civil cases, which requires where the slanderous words were spoken in a foreign language, that they be so set forth, together with a translation into English. This holding is reaffirmed and emphasized in Dunn v. State, 43 Texas Crim. Rep., 25. To our minds, the rule applies with equal force to case of libel, and we hold that the setting forth of the libelous article in Bohemian in the information, should have been followed by substantially a literal translation into English, which should in turn have been followed by another translation in English when necessary to make clear the meaning of said article by explanatory or *innuendo* averments.

It is also contended that the alleged libelous article was of such indefinite and general character as that it could not by averment be made to support a charge of libel. If we be correct in this opinion as to what we suppose to be the English translation of the alleged libelous article, stripped of its explanatory averments, we are of opinion that the *innuendoes*, as used, are not sufficient. The purpose of the libel law is to punish him who maliciously imputes to others in writing, etc., disgraceful conduct, bad character, crime, etc. and unless there be that in the alleged libelous publication *per se*, which would tend to indicate the person or persons aimed at, or meant to be attacked, it is difficult for us to conceive how *innuendo* could impart to the language used, the specific personal criminal intent necessary. A government or other body politic, a corporation, religious system, race of people, or a political

party, are not subject to criminal libel. Nor could a publication referring generally to any of these be made specific or libelous merely by inserting in the indictment at the dictum of the pleader, *innuendoes* stating that particular persons, members of such a party, religious system, or body politic, were meant. In our view, it is necessary that in such publication there be matters which to the persons to whom the same is communicated, would fairly tend to particularize and thus affect the persons alleged to be so libelled.

A man who scurrilously attacks the Smiths, Johnsons, Joneses, or the Jews, Gentiles, or Syrians, Democrats, Republicans, Populists, or office holders in general, could not be successfully haled into court and convicted of libel of any particular person, unless there be something in such article which by fair interpretation thereof, tended to bring into disrepute some particular person or persons. In the instant case, the reference in the alleged libelous article is to "those people whom you call leaders." There is nowhere any allegation that the parties alleged to have been libeled were known among the people referred to as "you" as leaders, or that any of the persons seeing such publication could know or conclude that those particular persons were meant. It is further stated in said article that such leaders "Have recognized the C. N. S. (meaning the Bohemion National Alliance)." It is not stated what the letters C. N. S. stood for, nor how the same meant, or could have meant the Bohemian National Alliance. Nor do we see anything in the article as published, which would justify the *innuendo* averment that the first word "they" as used, therein, means the parties whose names follow such words in parentheses, and who are alleged by the pleader to be meant and referred to by the use of said word "they." We are not holding that it could not be sufficiently alleged that the paper of appellant was a Bohemian paper, circulated among, and read by Bohemians and others in certain territory, and that such people or persons alleged to be libelled were known and recognized as the leaders; and that the Bohemian National Alliance was an organization among Bohemians for certain purposes; among others, to collect and receive gifts, and that one, Vojta Benes, had by some authority appointed said named persons to collect such gifts and donations, etc., etc.; but we do intend to say that the *innuendo* averments in the instant case do not so sufficiently allege. As said by this Court in Atchley v. State, 56 Texas Crim. Rep., 569: "The office of an *innuendo* is to define the defamatory meaning which the party seeks to put upon the words complained of, to show how they came to have the particular meaning claimed for them, as well as to show how they relate to plaintiff, whenever that is not clear from the face of the words, but an *innuendo* must not introduce new matter, or enlarge the meaning of words." The explanatory averments in the instant case do not show how the language used relates to the alleged injured parties, and does not

attempt to explain, but merely asserts, and asserts facts not suggested by the publication in any way, as we see it. In Squyres v. State, 45 S. W. Rep., 147, this Court said: "An *innuendo* helps nothing, unless the words precedent have a violent presumption of the *innuendo*. The business of an *innuendo* is by reference to preceding matter, to fix more precisely the meaning. The office of an *innuendo* is to explain, not to extend, what has gone before, and it cannot enlarge the meaning of words unless it be connected with some matter of fact expressly averred." We approve these expressions, except that we think *innuendo* may, in a particular case, point forward as well as backward. See also Potter v. State, 216 S. W. Rep., 886.

Believing that the complaint and information in the instant case do not charge any offense against the laws of this State, the case is reversed and ordered dismissed.

*Reversed and dismissed.*