**Victor LEAL & Ramon Leal, Appellants,**

v.

**The STATE of Texas, Appellee.**

**Nos. 13–85–016–CR, 13–85–017–CR.**

Court of Appeals of Texas, Corpus Christi.

May 1, 1986.

Rehearing Denied May 22, 1986.

Joseph A. Connors, III, McAllen, Larry Zinn, San Antonio, for appellants.

Benjamin Euresti, Jr., County Atty., Reynaldo S. Cantu, Jr., Gilberto E. Rosas, Brownsville, for appellee.

Before NYE, C.J., and KENNEDY and DORSEY, JJ.

## OPINION

KENNEDY, Justice.

A jury convicted appellants of murder and criminal conspiracy and assessed punishment at five years' imprisonment and a $5,000.00 fine for each count. Appellants bring twenty-five grounds of error. We reform and, as reformed, affirm the judgment of the trial court.

The deceased is Dr. Narciso Cortez. He was murdered for hire by one Wavil Lewis, Jr., who fled the scene of the shooting in a car driven by one Frank Loftis. Lewis and Loftis were hired by a man named Enrique Chapa. Lewis, Loftis and Chapa have confessed their crimes. It is alleged that appellants, who are brothers-in-law of Enrique Chapa, initiated and financed the killing (Victor Leal) and provided guidance by way of information as to the deceased's personal habits (Ramon Leal). The killing arose over a land dispute.

The indictment herein charges appellants with capital murder and conspiracy to commit capital murder. At trial appellants moved to require the State to elect which charge to proceed upon, which motion was denied by the trial court. This denial forms the basis for appellants' first two grounds of error.

"Two or more offenses may be joined in a single indictment, information, or complaint, with each offense stated in a separate count, if the offenses arise out of the same criminal episode, as defined in Chapter 3 of the Penal Code." TEX.CODE CRIM.PROC.ANN. art. 21.24(a) (Vernon Supp.1986). TEX.PENAL CODE ANN. § 3.01 (Vernon 1974) defines criminal episode as "the repeated commission of any one offense defined in Title 7 of this code (Offenses Against Property)." Neither capital murder nor conspiracy to commit capital murder come within the scope of Title Seven of the Penal Code.

When an indictment charges two or more non-property offenses arising from a single criminal transaction, only one conviction and one punishment may result therefrom. *Ex parte Siller*, 686 S.W.2d 617, 618 (Tex.Crim.App.1985). If an indictment charges two or more non-property offenses arising from two or more criminal transactions, a defendant has a right, upon a timely motion to elect, to require the State to elect on which count in an indictment it will seek to convict. *Smith v. State*, 101 Tex.Cr.R. 615, 276 S.W. 924, 925 (Tex.Crim.App.1925); *see Drake v. State*, 686 S.W.2d 935 (Tex.Crim.App.1985). Unlike a single criminal transaction situation, failure to demand an election or to protest conviction in a multiple criminal transaction situation constitutes waiver of that error. *Id.* at 945. However, if there are multiple criminal transactions and the defendant moves for election, the trial court's denial of this motion is reversible error and the cause is remanded for new trial. *Smith*, 276 S.W. at 925 [1]. The rationale for distin-

---

1. *Cf. Sifford v. State*, 704 S.W.2d 571 (Tex.App. —Corpus Christi 1986, pet. filed) (reversible error for a trial court to refuse to grant a timely *motion to quash* an indictment that alleges more than one offense).

guishing between single and multiple transactions is to limit the jury's consideration of transactions not properly before them. Appellants did move for election; therefore, we must determine whether the murder count and the conspiracy count arose from the same criminal transaction.

The "same criminal transaction" means that the two counts are a variation of the same act, or in other words, a single guilty intent runs through and connects both acts. *McIntire v. State*, 698 S.W.2d 652, 656 (Tex.Crim.App.1985); *Holcomb v. State*, 696 S.W.2d 190, 193 (Tex.App.— Houston [1st Dist.] 1985, no pet.). Whether two counts arise from the same criminal transaction depends upon the facts and circumstances of each particular case. Appellants rely on *Betts v. State*, 60 Tex.Cr.R. 631, 133 S.W. 251 (Tex.Crim.App.1911) for the proposition that murder and criminal conspiracy are separate transactions. However, the *Betts* court never reached that conclusion. They concluded that the indictment charged two separate and distinct felonies (not transactions); that the trial court should have either quashed the indictment (pursuant to the defendant's motion) or compelled the State to elect on which it would proceed; that there was no harmful error in overruling the defendant's motion as the murder count was the only one to go to the jury; but never did the *Betts* court hold that murder and criminal conspiracy were separate criminal transactions. *Id.* at 254–55. The same intent and actions that caused appellants to be culpable for criminal conspiracy provided the basis for their culpability to the murder.

We conclude that the indictment herein charged two non-property offenses which arose from the same criminal transaction and, therefore, only one conviction and one punishment may result therefrom pursuant to *Ex parte Siller*. Since the judgment indicates that the jury first found appellants guilty of murder, the judgment is reformed to show appellants guilty of that offense only, and the latter conviction and sentence for criminal conspiracy is vacated and set aside. *Ex parte Siller*, 686 S.W.2d at 620. We sustain appellants' first and second grounds of error.

Appellants, by their third ground of error, complain that the trial court erred in allowing the State to amend the first ground of the indictment.

Prior to trial, the State decided to proceed on murder rather than capital murder. The indictment in the record is the original and is not amended. However, upon reading the indictment to the jury pursuant to TEX.CODE CRIM.PROC.ANN. art. 36.01 (Vernon 1981) the prosecuting attorney deleted parts of the indictment, which involved the capital murder aspect of the count. The relevant portion of the indictment read:

[The defendants named below did,] as parties to the offense, intentionally and knowingly cause the death of an individual, Narciso Cortez, by shooting him with a firearm, and that Defendant Wavil Bernard Lewis, Jr. did then and there commit the aforesaid murder of Narciso Cortez for remuneration, to-wit: United States Currency; and that the Defendant Enrique Chapa did then and there employ the aforesaid Wavil Bernard Lewis, Jr. for remuneration and the promise of remuneration, to-wit: United States Currency, to kill the aforesaid Narciso Cortez by shooting him with a firearm; and that the Defendant Victor Leal intentionally and knowingly provided the remuneration, to-wit: United States Currency, to the aforesaid Enrique Chapa for payment to the Defendant Wavil Bernard Lewis, Jr. for killing Narciso Cortez; and that the Defendant Ramon Leal intentionally and knowingly encouraged, directed, aided and attempted to aid the aforesaid Enrique Chapa and Wavil Bernard Lewis, Jr. in the commission of the offense by providing information and guiding the aforesaid Enrique Chapa to locations where the aforesaid Narciso Cortez resided and worked, knowing that the aforesaid Enrique Chapa had employed another to kill the aforesaid Narciso Cortez,....

The prosecuting attorney read to the jury:

[P]resent that Wavil Bernard Lewis, Jr., Enrique Chapa, Victor Leal, and Ramon

Leal on or about the 31st day of August A.D. One Thousand Nine Hundred and Eighty-two, and anterior to the presentment of this indictment in the County of Cameron and State of Texas, did then and there unlawfully, as parties to the offense, intentionally and knowingly cause the death of an individual, Narciso Cortez, by shooting him with a firearm, and that Defendant Wavil Bernard Lewis, Jr., did then and there commit the aforesaid murder of Narciso Cortez.

The language charging Victor Leal with employing for remuneration and the promise of remuneration and Ramon Leal with providing information and guiding Enrique Chapa was deleted when read to the jury.

■■■ The indictment was not altered or amended in any way. Since murder is a lesser included offense of capital murder, the greater offense, when properly alleged, necessarily includes all the lesser included offenses. *Allison v. State*, 618 S.W.2d 763, 764 (Tex.Crim.App.1981). Each of the constituent elements of the lesser included offense need not be alleged in the wording of the indictment. *Id.* As to the deletions by the prosecuting attorney upon reading the indictment to the jury,[2] no reversible error occurs when a timely objection does not result from a misreading of the indictment. *Craig v. State*, 480 S.W.2d 680, 684 (Tex.Crim.App.1972); *Nolan v. State*, 624 S.W.2d 721, 724 (Tex.App.—Amarillo 1981, no pet.). Appellants made no objections to the misreading of the indictment. We overrule appellants' third ground of error.

Appellants, in their fourth ground of error, complain that the indictment is defective because it fails to allege the facts which form the basis of appellants' criminal responsibility for the offense committed by another.

■■■ Appellants assume that an "amendment" of the indictment occurred, as complained of in ground of error three, thereby rendering the indictment defective.

Appellants concede that the original indictment sufficiently alleged facts which form each appellant's criminal responsibility. We found the original indictment was not altered or amended in any way, and what appellants assume to be an "amendment" is a misreading of the indictment under TEX.CODE CRIM.PROC.ANN. art. 36.-01(1) (Vernon 1981). The indictment contained in the record sufficiently charges appellants with capital murder and its lesser included offenses. Appellants may be charged directly with the commission of an offense although it was not actually committed by them.[3] *Pitts v. State*, 569 S.W.2d 898, 900 (Tex.Crim.App.1978); *Burkhalter v. State*, 655 S.W.2d 215, 223 (Tex.App.—Corpus Christi 1982), *pet. dism'd*, 655 S.W.2d 208 (Tex.Crim.App. 1983); *accord* TEX.PENAL CODE ANN. § 7.01 (Vernon 1974). We overrule appellants' fourth ground of error.

Appellants, through their eighth and ninth grounds of error, complain that the trial court erred in failing to quash the second count of the indictment.

Because we have already held that the conviction and sentence for criminal conspiracy must be vacated and set aside, pursuant to *Ex parte Siller*, we need not address appellants' eighth and ninth grounds of error.

Appellants, in their fifth ground of error, complain that the trial court erred in admitting a tape, which was not translated from Spanish to English, into evidence.

Enrique Chapa met with Ramon Leal wearing a concealed microphone to permit law enforcement personnel to tape the conversation. Chapa and Ramon used "Tex-Mex," a Spanish dialect common to South Texas, throughout the conversation. The trial court admitted the tape into evidence. The jury heard the tape with the aid of a verbatim transcript of the tape and then heard it again with the aid of an English transcript prepared by the prosecuting at-

---

2. Pursuant to TEX.CODE CRIM.PROC.ANN. art. 36.01 (Vernon 1981).

3. The indictment read to the jury, although it deleted language referenced to the capital murder charge, did charge appellants directly with the commission of an offense (murder).

torney. Neither transcript was admitted as evidence, but rather were "aids" to the jury.[4]

Prior to the admission of the tape, a lengthy discourse occurred on the admissibility of the tape. In order to determine whether Ramon Leal made an admission against interest, the trial court announced it would inspect a translation done by the State, at which point appellants complained that the State's translation was erroneous in parts. The trial court allowed appellants twenty-four hours to prepare a transcript and stated it would withhold its ruling until such time. If the tape was admissible, the trial court announced that the Court would bring in an official translator; the jury and the translator would listen to the tape; and the translator would translate the tape into English for the jury. Further, the trial court announced it would relax the Rule so as both the State and the defendants may have a linguistics expert present to listen to and testify with regard to the tape.

Appellants then objected to the playing of the tape to the jury as deprivation of effective assistance of counsel.[5] Appellants' rationale under this objection was that defense counsel, not fluent in Spanish, would be "unable to respond in any intelligent way to the tape itself and what they (the jury) may have heard and what they may have concluded they have heard by the Court permitting it to be handled this way." The trial court overruled appellants' objection.

■■■■■ This appears to be a question of first impression in Texas. We do not believe a tape recording is rendered inadmissible merely because the conversation is spoken in a foreign language. The situation at hand is analogous to one in which a non-English-speaking witness testifies. Texas established long ago the need for interpreters when non-English-speaking witnesses take the stand. Otherwise, the

valuable right of cross-examination would be lost. *Garcia v. State*, 151 Tex.Cr.R. 593, 210 S.W.2d 574 (Tex.Crim.App.1948); TEX.CODE CRIM.PROC.ANN. art. 38.30 (Vernon Supp.1986); *see also Borski v. State*, 154 Tex.Cr.R. 84, 225 S.W.2d 180 (Tex.Crim.App.1949); *Drozda v. State*, 86 Tex.Cr.R. 614, 218 S.W. 765 (Tex.Crim.App. 1920) (court held documentary evidence in foreign language should be accompanied by an English translation). Article 38.30 states that if it is determined that a witness does not understand and speak English, then upon proper motion an interpreter must be sworn to interpret for him. These same safeguards apply to the evidence at hand.

■■■■ Although the trial court announced its intention of interpreting the tape through a translator, it did not do so after the following statements by appellants:

MR. BURNETT:[6] Your Honor, our problem—

THE COURT: Push the door to.

MR. BURNETT: —is that in the preparation of any translation for the Court done by tomorrow is absolutely impossible.

Indispensable to the doing of that is Ramon Leal. And in this connection, Mr. Chapa played a very important role in helping to make the transcript, the translation that Your Honor has. It's very important that the party to the conversation have input into what was said. We've been trying to work out some sort of a procedure whereby we could keep our objections and just—

THE COURT: Get Mr. Cantu in here.

MR. BURNETT: —let Your Honor go ahead and rule on the admissibility and then just meet that what we are calling the October 5th transcript head on. Just play it, but not waiving any of our objections and get on with this thing.

---

4. The transcripts are in the record, marked State's Exhibit 94 and 95.

5. The record indicates that objections by either Ramon or Victor Leal suffice for both due to the nature of the trial.

6. Mr. Burnett is counsel for Ramon Leal.

We need Ramon here in court and for other things. This evening it is just physically impossible for us to get it done. So, what we would like to do then is keep our objections, the State go ahead on what they call an October 5th transcript, and we'll just meet it head on like we did in the bond hearing.

You didn't hear what I said preliminarily.

MR. CANTU: No, I'm sorry.

MR. BURNETT: I'm just saying we can't get a translation by tomorrow because the party to the conversation is indispensable to a translation. As you know, Mr. Chapa played such a role in creating the transcript and Ramon would play a role in creating any transcript we have.

We need him here and we need him doing other things in this stage of the trial. We're suggesting, but not waiving any objections, that if you think your position is sound to just go ahead and use the October 5th. You would be taking your chances with the October 5th transcript, and let her rip and do it as we've done it. And we'll start cross examining just as soon as you finish playing the tape.

Appellants waived any objections they had with regard to the State's transcript for admissibility purposes. Thereafter, the trial court received the tape into evidence. However, instead of proceeding with an interpreter, the tapes were played and the jury was "aided" by the transcript prepared by the State. Appellants neither objected to proceeding in this fashion nor to dispensing of the transcripts amongst the jury.

■ Appellants waived any error which may have occurred by proceeding with a transcript instead of an interpreter when they failed to object to the dispensing of the transcripts, coupled with their waiver of any infirmities in the transcript when the tape was admitted into evidence. *See Perry v. State,* 703 S.W.2d 668 (Tex.Crim. App.1986); *Patton v. State,* 617 S.W.2d

255, 256 (Tex.Crim.App.1981); *Salinas v. State,* 507 S.W.2d 730, 731 (Tex.Crim.App. 1974). The tape was admissible into evidence. The better procedure with regard to the translation would be to bring in an interpreter, under oath, and allow the interpreter to translate the tape to the jury. Thereby, the interpreter is subject to cross-examination. However, no reversible error occurred in substituting the transcript for the interpreter. Appellants had no objections to this procedure. We overrule appellants' fifth ground of error.

In their sixth ground of error, appellants complain there was "insufficient evidence as a matter of law to corroborate the accomplice testimony as to Ramon Leal."

To test the sufficiency of the corroborating testimony, the Court of Criminal Appeals in *Castaneda v. State,* 682 S.W.2d 535 (Tex.Crim.App.1984) held:

> [T]he reviewing court must eliminate from consideration the evidence of the accomplice witness, and then examine the evidence of the other witnesses to ascertain if it is of an incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient.... The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt.... However, a conviction cannot stand if the corroborative evidence does no more than point the finger of suspicion towards an accused.

*Id.* at 537–38; *see Paulus v. State,* 633 S.W.2d 827, 846 (Tex.Crim.App.1982). State's Exhibit 85, the tape, sufficiently corroborates the testimony of Enrique Chapa to connect Ramon Leal with the murder. Enrique Chapa testified that Ramon's involvement comprised driving Enrique around Brownsville. Specifically, Ramon pointed out the victim's home, office and establishments he frequented.

The incriminating portions of the conversation are as follows: [7]

_____

**7.** E.C. is Enrique Chapa and R.L. is Ramon Leal.

E.C.: Well, damn and-she says-says-that I'm taking the whole rap-and-and that—she says, damn, Ramon-that you know—that—you know—you know like—I—like as I tell you-she says damn, Ramon is also smeared. S____, he knows, he showed you over there-of-of-Narciso and all that s____, and she says and he doesn't want to put in any' money, and s____ you know.

R.L.: I gotta fight for my ass.

R.L.: Save myself financially, right now I don't have any money. From where, from where?

\* \* \* \* \* \*

E.C.: Like you know, like Nena told me, she said damnit they're going to smear me-me-me-and you know she didn't have anything to do with it, and-and-Ramon is coming out clean, and he knows everything about the death of Narciso and everything (inaudible).

R.L.: What does she want to do, hang me, I don't give a s____, look-like I told Nena a long time ago I am not afraid to die, I'm (inaudible) I don't know what it is about me, I ain't afraid to die.

\* \* \* \* \* \*

E.C.: But like she says, like—the way Nena explained it to me she says damnit—ah—ah—ah you know ah Ramon damnit he—he took you over there and showed you the whole s____-and-and-he's not putting one penny. I haven't seen one penny out of him. I told her, well I don't know, my goodness, uh I'm just going to have to fight it my own way, I guess, you know, use my little, the little money that I've got because soon—it'll go to court and—he's over there bugging me for money.

R.L.: Who is bugging you for

E.C.: Over there Ruben

R.L.: Why?

\* \* \* \* \* \*

E.C.: You know, I-you know, I mean when, when-when you/they called me damnit, I didn't charge you/them anything. You know it was all a freebie,

but I didn't think it was going to turn out this way.

R.L.: Hum-hu.—Turn out how?

E.C.: Getting caught (pause) (coughing) I just wanted to, you know, to talk to you about, you know, Nena's and Mark's, damnit, I'm gonna go in, I'm going to go in, but you know, damnit, Nena says that s____, that, that you know, you guys are going to go free, and I'm going to go in.

R.L.: What do you mean free? How much money do you think Victor has spent in this case?

\* \* \* \* \* \*

R.L.: But he wants guaranteed that he is going to have the appeal, I wouldn't if I were you. It's gonna, uh, the way the case is (inaudible) Wavil, you got no problems (inaudible) the other character (inaudible) now, let me tell you the facts, if you talk you smear Victor, you smear me, the only thing you're going to do for sure you get fifteen to twenty, for sure.

E.C.: Fifteen to twenty what?

R.L.: Years, that you were involved in it, if you admit that you were involved with other people for sure you can get 15 for sure.

\* \* \* \* \* \*

R.L.: I am going to have to get the lawyer. Victor is going to get more money and there won't be any of this "each one for himself" bit. That's the way it's gotta be (inaudible).

E.C.: Gloria is going to give land back.

R.L.: Oh yea, well it's not hers, it's daddy's. She knows it, she doesn't want any squabbles. They're investigating her also because they think she had something to do with it.

\* \* \* \* \* \*

E.C.: Because as Sandoval told me, he says "Where the hell could you have gotten that money from and all that s____."

(Inaudible) They are going to make you spit it out and all that s____.

R.L.: They are going to make you?

E.C.: I get kind of nervous, I s____, about you know, like the family. What the hell (inaudible).

R.L.: The family, if you don't talk implicating anybody else, (inaudible) Gloria, but you'll smear us all up, and the little boy is not gonna, then where is there going to be money for.... And then we get lawyer, lawyer for me, you know. You know what I get? I get me a Court appointed lawyer, that's what I get, 'Cause I don't have the money to hire one, Court appointed lawyer ... I don't have and I can prove to the Court, that I am broke, I don't own nothing not even the cars are mine, they belong to the finance companies, and I got receipts for late payments and s____. There, look, they'll give me a Court appointed lawyer.

■■■■ Motive is a factor that may also be considered with other evidence tending to connect the accused with the crime. *Paulus,* 633 S.W.2d at 846. Animosity existed between the appellants and the victim as a result of a family land squabble. Fidel Leal, father of the appellants, aided Ramon Leal in the purchase of farm land in the mid-1960's. Due to a default on the payment of that loan and the possibility of a deficiency judgment, Fidel Leal transferred 644 acres of land (not the farm land purchased for Ramon) to Narciso Cortez to defraud creditors. This 644 acres eventually became the subject of the "Cortez Trust," with Narciso Cortez as trustee and for the benefit of Narciso Cortez' children. Fidel Leal brought an unsuccessful suit against Narciso Cortez to have a constructive trust placed over the 644 acres. Narciso Cortez then brought suit for an accounting of the profits from the land and a forcible entry and detainer against Ramon Leal. The land Ramon lived upon in 1982 was part of the principal of the trust. The accounting was pending at Narciso Cortez' death. Subsequent to his death, Gloria Cortez, wife of the victim and appellants' sister, dismissed the action in her role as substitute trustee.

We find the tape recording to be sufficient to corroborate the testimony of Enrique Chapa. Appellants' sixth ground of error is overruled.

■■■■ Appellants, by their tenth ground of error, complain that there is "legally insufficient evidence tending to connect appellant Victor Leal" to the murder of Narciso Cortez.

Along with the motive factor, concerning the land dispute, the evidence contains checks written by Victor Leal to the Chapas which coincide with the amount the Chapas testified was outstanding on the contract killing. The evidence also contains the phone records of Victor Leal and the Chapas which show an inordinate number of calls between the Chapas and Victor Leal for the months immediately preceding and subsequent to the murder, inconsistent to the virtual lack of communication previously existing between the parties.

Wavil Lewis testified that the "contract" price was $15,000. Enrique Chapa testified that he told Victor the price was $20,000. Enrique planned to pocket $5,000 dollars as "expense" money. Lewis and Chapa testified that Chapa paid Lewis and Loftis $10,000 cash the day after the shooting; the balance was to be paid in Dayton, Ohio. Magdalena Chapa testified that Victor Leal gave her another $3,000 cash towards the outstanding balance before they returned to Dayton. Enrique and Magdalena returned to Dayton after the Labor Day weekend with a balance of $7,000 still owing. The state introduced two checks totaling $3,000, payable to Magdalena Chapa, which Victor Leal signed. The $2,000 check is dated October 21, 1982, and the $1,000 check is dated November 18, 1982. Further, a cashier's check for $2,000 payable to Magdalena and naming Victor Leal as the remitter, dated November 18, 1982, is in evidence. Magdalena Chapa testified that Victor paid the remaining balance of $2,000 in cash in December of 1982 while she was visiting for the holidays. The evidence shows a $1,800 deposit to Magdale-

na's account following this Christmas vacation.

Lewis testified that Enrique Chapa paid the remaining $5,000 due on the contract in Dayton, Ohio. Magdalena testified that she took the $3,000 cash that Victor gave her and drew a check for $2,000 from her own account, which is in evidence, to fulfill the balance owed Lewis.

Further, Victor Leal attempted to establish an alibi with regard to August 10, 1982, the date that Magdalena claims she and Victor had two phone calls in which Victor asked her to have Enrique find an assassin. Victor claimed he was in Victoria, Mexico, and that he stayed at the San Antonio Hotel. The State offered rebuttal evidence to show that the hotel's records did not support this contention. Neither the hotel ledger, the receipts nor the registration forms show Victor Leal stayed at the San Antonio Hotel on August 10, 1982.

With regard to motive, Victor Leal admitted he helped finance his father's suit against Narciso Cortez and felt animosity towards the victim. Magdalena testified that the August 10th phone calls between Victor and herself relayed a sense of urgency due to the victim's accounting action, which Gloria Cortez dismissed upon her husband's death.

There is sufficient evidence, which tends to connect the defendant with the commission of the offense, to corroborate the accomplice testimony. We overrule appellants' tenth ground of error.

█ Appellants, in their eleventh ground of error, complain that the trial court erred in admitting hearsay evidence. Specifically, appellants complain of the introduction of a portion of a civil trial transcript, the accounting action between Fidel Leal and Narciso Cortez. In the civil proceeding, Joe Cisneros, counsel for Fidel Leal, questioned Tony Martinez' authority to continue as counsel for the "Cortez Trust" due to Narciso Cortez' incapacity. The State introduced this evidence to establish a motive; that being the appellants' desire to terminate the accounting lawsuit.

Assuming this evidence is inadmissible, any error committed by the trial court in its admission is harmless due to the introduction of same or similar evidence in the record without objection. *Thomas v. State*, 621 S.W.2d 158, 164 (Tex.Crim.App. 1981); *Crocker v. State*, 573 S.W.2d 190, 201 (Tex.Crim.App.1978); *see Sanne v. State*, 609 S.W.2d 762, 774 (Tex.Crim.App. 1980), *cert. denied*, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981). Tony Martinez and Gloria Cortez testified as to the same matters challenged under this ground of error. We overrule appellants' eleventh ground of error.

Appellants, through grounds of error twelve, fifteen, sixteen and seventeen, complain that the trial court erred in denying appellants exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The *Brady* Court stated:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

The principle of *Mooney v. Holohan* [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)] is not punishment of society for misdeeds of a prosecutor *but avoidance of an unfair trial to the accused.* Society wins not only when the guilty are convicted but when criminal trials are fair; *our system of the administration of justice suffers when any accused is treated unfairly* (emphasis added).

*Id.* at 87, 83 S.Ct. at 1196. The prosecuting attorney stated in opening statements that accomplice witnesses had lied in previous hearings, and appellants moved that those portions of previous testimony which were false be provided them. The trial court denied this motion. The accomplice witnesses testified as to previous testimony that was false and appellants cross-examined the witnesses on this testimony.

█ Accomplice witness credibility is material and the prosecutor should not

suppress evidence of false testimony. *See Burkhalter v. State*, 493 S.W.2d 214, 218 (Tex.Crim.App.1973); *Crutcher v. State*, 481 S.W.2d 113, 116 (Tex.Crim.App.1972). However, such is not the case at hand. The prosecutor in opening statements revealed his knowledge of prior false testimony. The accomplice witnesses testified as to that false testimony and appellants cross-examined the witnesses. Appellants were accorded due process of law and no reversible error was committed. Appellants had the opportunity to cross-examine the witnesses as to their credibility. *Payne v. State*, 516 S.W.2d 675, 677 (Tex. Crim.App.1974); *see Burkhalter*, 493 S.W.2d at 218; *Crutcher*, 481 S.W.2d at 116–17; *Means v. State*, 429 S.W.2d 490, 494 (Tex.Crim.App.1968). We overrule appellants' twelfth and fifteenth through seventeenth grounds of error.

■ Appellants, in grounds of error thirteen and fourteen, complain that the trial court erred by denying appellants' motion for psychiatric evidence.[8] Specifically, appellants desired discovery of any psychiatric records with regard to Magdalena Chapa.

The trial court took the records in camera prior to trial. During trial, appellants asked for the records to cross-examine Magdalena Chapa. Some confusion occurred as to the whereabouts of the records. Upon learning the trial court possessed them in camera, the trial court announced it would withhold any ruling until the court had opportunity to make an in camera inspection. Cross-examination of Magdalena Chapa continued and the trial court made no ruling as to the discoverability of the records.

Appellants' failure to secure an adverse ruling on the motion for psychiatric evidence preserves nothing for review. *Collection Consultants, Inc. v. State*, 556 S.W.2d 787, 794 (Tex.Crim.App.1977), *appeal dismissed*, 436 U.S. 901, 98 S.Ct. 2228, 56 L.Ed.2d 399 (1978); *see Stevens v. State*, 671 S.W.2d 517, 521 (Tex.Crim.App.1984); *Martinez v. State*, 565 S.W.2d 70, 71 (Tex.

Crim.App.1978). We overrule appellants' thirteenth and fourteenth grounds of error.

Appellants, by grounds of error eighteen and nineteen, complain that the trial court erred by requiring the appellants to tender to the State a communication from Kathy Leal, Victor's wife, to appellants' attorney. Appellants contend the communication was privileged, either by the husband-wife privilege or the attorney-client privilege. Appellants also contend that there was no right of discovery by the State of this communication and it constitutes a violation of Victor Leal's Fifth Amendment right against self-incrimination.

■ The communication, which is in evidence, consists of the following:

Abel Toscano

Douglas Tinker

Dear Mr. Tinker and Mr. Toscano,

On August the 10th, 1982, after I had talked to Nena, I called Tampico, Mexico. I talked to Ignacio Sanchez Neira (Nacho). I called him to make sure that he would know that Victor had already left for Victoria, Mexico around 2:30 P.M. so that Nacho would know what hour that Victor would be there. Nacho is the person that met Victor in Victoria, MEXICO.

I also called my step-son Victor Lino in Houston and told him that I had talked to his aunt Nena about letting Mark go with us.

I also called my step-son Victor Jr. in Corpus Christi, Texas. I told him that we had sent his fish that he had caught in Port Isabel off to be mounted. He had hoped to go with us to Tampico, but he could not get off of work for two weeks. Both of my stepsons were with us on two Tournaments in 1982.

Kathy Leal

The State used this communication to impeach the testimony of appellants' witness, Kathy Leal. This communication is inconsistent with the witness' direct testimony that she was unable to speak with Neira

---

**8.** The motion alternatively sought exclusion of the witness if the records were not discoverable.

because he had left to meet her husband. This testimony regards Victor Leal's alibi for August 10, 1982, the day Magdalena Chapa claims Victor asked that Enrique find someone to kill the victim.

 Statements that are made by a wife to a third party do not come within the husband-wife privilege under TEX.CODE CRIM.PROC.ANN. art. 38.11 (Vernon Supp.1986). *Stallings v. State*, 476 S.W.2d 679, 681 (Tex.Crim.App.1972); *Wolf v. State*, 674 S.W.2d 831, 842 (Tex.App.—Corpus Christi 1984, pet. ref'd). Appellants' contention is without merit.

 The purpose of the attorney-client privilege, TEX.CODE CRIM.PROC. ANN. art. 38.10 (Vernon Supp.1986), is the promotion of communication between attorney and client. The privilege protected is personal to the client. *Cruz v. State*, 586 S.W.2d 861, 865 (Tex.Crim.App.1979). It is clear that Kathy Leal is not a client within the scope of this privilege. Appellants' contention is without merit.

 At the trial, appellants' only objections to disclosure of the communication concerned the husband-wife and attorney-client privileges. When the objection made in the trial court is not the same as that urged on appeal, appellant has not properly preserved this complaint for review. *Hebert v. State*, 586 S.W.2d 529, 532 (Tex. Crim.App.1979); *Williams v. State*, 549 S.W.2d 183, 187 (Tex.Crim.App.1977). Therefore, appellants' remaining contentions under these grounds have not been properly preserved. We overrule appellants' eighteenth and nineteenth grounds of error.

Appellants, by their twentieth, twenty-first and twenty-second grounds of error, complain that the trial court erred in allowing the State to cross-examine Kathy Leal, Victor's wife, "on matters not germane to her direct testimony" and "the contents of a sworn divorce pleading."

 An error in asking an improper question or in admitting improper testimony can generally be cured except where the question or evidence is clearly calculated to inflame and prejudice the minds of the jurors. *Boyde v. State*, 513 S.W.2d 588, 593 (Tex.Crim.App.1974). "Only in the most exceptional cases could an unsuccessful attempt to elicit inadmissible testimony require a mistrial." *Johnson v. State*, 583 S.W.2d 399, 407 (Tex.Crim.App.1979).

 All of the questions appellants complain about under their twentieth and twenty-second grounds of error fall without the exception stated in *Boyde*. The trial court sustained appellants' objections to all, save one, and the trial court admonished the jury to disregard when requested. The questions, which may not have been germane to Kathy Leal's direct testimony, were not of the nature which would prejudice the minds of jurors.

 The State may show any bias, prejudice, interest and motive of the witness in testifying as she did. *Massengale v. State*, 653 S.W.2d 20 (Tex.Crim.App. 1983). In *Chvojka v. State*, 582 S.W.2d 828 (Tex.Crim.App.1979), the Court of Criminal Appeals held:

[T]rial courts have considerable discretion as to how and when bias may be proved and as to what evidence is material for that purpose.... The trial judge must balance the probative value of the evidence sought to be introduced against the potential risks of undue prejudice, embarrassment or harassment of either a witness or a party, the possibility of misleading a jury, and the possibility of undue delay or waste of time.

*Id.* at 831. The trial court did not err in allowing the prosecuting attorney to inquire whether Kathy Leal ever feared her husband. This was a proper inquiry into the nature of their relationship and motive of the witness for her testimony. *See Carter v. State*, 668 S.W.2d 851, 853 (Tex.App. —San Antonio 1984, pet. ref'd). We overrule appellants' twentieth through twenty-second grounds of error.

 Appellants, by grounds of error twenty-three and twenty-four, complain that the trial court erred in denying Victor

Leal's motion for mistrial based upon the State's rebuttal witness' testimony.

The State further attempted to discredit Kathy Leal's testimony. The prosecuting attorney inquired, "Did she ever express a fear that Victor Leal would put a contract out for her?" However, appellants' objection to the question was sustained and the trial court instructed the jury to disregard the question. The trial court's instruction sufficiently cured any error and a mistrial was not required. *See Johnson*, 583 S.W.2d at 407; *Boyde*, 513 S.W.2d at 593. We overrule appellants' twenty-third and twenty-fourth grounds of error.

▆▆ Appellants, in their twenty-fifth ground of error, complain that they were denied a fair trial due to the prosecutor's misconduct in questioning Tony Ayala, an F.B.I. agent.

Again, appellants' objections were sustained and the jury instructed to disregard the prosecutor's questions. The prosecuting attorney questioned Ayala about Luis Serna, a resident of Mexico. Ayala was familiar with Serna through observations involving narcotics stake-outs. Appellant Victor Leal and Serna had been linked together as associates earlier in the trial. The trial court's instruction sufficiently cured any error which may have occurred. We overrule appellants' twenty-fifth ground of error.

The judgment of the trial court is AFFIRMED with respect to the murder conviction, and REFORMED to delete the conviction for criminal conspiracy.