**John Charles ZIMMERMAN, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69058.

Court of Criminal Appeals of Texas, En Banc.

April 20, 1988.

Rehearing Denied May 18, 1988.

---

Jay W. Burnett, Terrence Gaiser, Houston (court appointed), for appellant; Robert A. Morrow, Catherine Greene Burnett, Janet Seymour Morrow, Houston, of counsel.

John B. Holmes, Jr., Dist. Atty., James C. Brough and Robert Moen, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

Appellant was convicted of capital murder.[1] After the jury found appellant guilty and answered the two special issues submitted under Article 37.071, V.A.C.C.P., the court imposed the death penalty as required by law. V.T.C.A., Penal Code, § 12.31.

Appellant does not challenge the sufficiency of the evidence to sustain the conviction or the affirmative answers to the special issues. Nevertheless, he raises fourteen points of error, nine of which allege that reversible errors were committed during the voir dire examination of the jury panel. The remaining points of error claim: (10), (11) that the trial court erred in admitting in violation of Articles 38.11 and 38.22, V.A.C.C.P., a letter written by appellant to his wife while he was in custody; (12) that appellant's trial was barred by the Double Jeopardy Clause of the State and Federal Constitutions; (13) that the trial court erred in admitting evidence via other parts of the aforementioned letter of unsubstantiated extraneous acts of misconduct at the penalty stage of the trial; and (14) that the trial court erred in overruling appellant's timely second motion to quash the indictment.

We reverse the conviction because of the improper introduction of appellant's letter or parts thereof at the guilt and penalty stages of the trial. In view of our disposition of the cause, we find no necessity in discussing the nine points of error dealing with the voir dire examination,[2] but we shall discuss the other points.

In order to place the facts in proper perspective, we shall briefly mention the same.

According to several witnesses appellant was seen at Jacinto City Elementary School

---

1. Appellant had previously been tried, convicted, and assessed the death penalty in the same cause. However, on February 15, 1979, appellant's Motion for New Trial was granted.

2. We observe, however, several points of error relating to the voir dire examination of the prospective jurors reflect error, perhaps reversible error. Nearly all the voir dire points of error refer to the refusal of the trial judge to permit defense counsel to question prospective jurors at all before they were excused for cause.

See *Perillo v. State,* 656 S.W.2d 78 (Tex.Cr.App. 1983). While any error resulting may be shown to be harmless, *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981), *cert. den.,* 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457, trial judges are skating on thin ice, despite the wide scope of their discretion in voir dire matters, to totally exclude any interrogation by defense counsel, and to limit such questioning as in the instant case to the prosecutor and the court itself before ruling on challenges for cause.

on March 24, 1977, between 2:30 p.m. and 3:00 p.m. He was looking for Ramona Abner, the daughter of his sister-in-law, Sandra Abner. Norma Salinas, a teacher's aide, testified that appellant had told her that Ramona's parents were in the hospital. Four other witnesses stated the man they identified as appellant told them Ramona's mother, or both parents, were in the hospital or that some emergency had occurred. Leonard Jones, principal at Jacinto City Elementary, testified that no one in his office gave appellant permission to take Ramona from school on March 24.

Douglas Bogott, the physical education teacher, released Ramona from class after appellant told him: "There's an emergency. I need to pick up Ramona Abnor." Bogott recalled that Ramona immediately stood up and came forward, saying: "That's my uncle." When Bogott asked appellant whether he had a permission slip to take Ramona out of class, appellant answered "no," but stated that he would get one on the way out. The two then left the auditorium-gym together.

Sandra Abner testified that on March 24 her ten-year-old daughter Ramona failed to return from her third grade classes at Jacinto City Elementary. Sandra noticed that her daughter's bicycle was in the yard at 4:15 p.m., but that Ramona was nowhere around. Upon the advice of her husband, James Abner, Sandra went to the police station shortly before 5:00 p.m. and reported Ramona as missing. Sandra then drove to her sister's apartment, where she saw the appellant. Sandra asked the appellant whether he or Sherry, Sandra's sister, had picked Ramona up from school that day and appellant replied "no."[3] Sandra then informed appellant that her daughter was missing, to which appellant responded: "I'll go get Sherry, and we'll be right over." Sandra testified that appellant "acted concerned, like I considered normal for an uncle, I guess."

Appellant and Sherry arrived at Sandra's home around 5:15 p.m. Appellant asked Sandra for a picture of Ramona and said he would get a couple of buddies to help look for her. Sandra next saw appellant at her home after 7:00 p.m. when he came to pick up Sherry. Sandra testified that at that time the police arrived and "picked him [appellant] up in front of the house there." Sandra learned of Ramona's death around 5:30 a.m. on March 25.

At 3:15 a.m. on March 25 Patrolman Bill Norman, a patrolman with the Hedwig Village Police Department, was called to the corner of Gessner and Katy Freeway in Houston where he met "Chief Jamail" of Jacinto City. Chief Jamail was in another car and Patrolman Norman later learned that appellant was also riding in the car. Norman followed Jamail's vehicle to a townhouse project under construction in the Memorial area of Harris County. Chief Jamail and two police officers informed Norman that they were "looking for a girl's body," and it was Norman who ultimately found the body in the utility room of an unfinished garage. According to Larry Kleine, who had been a construction supervisor at the townhouse project, appellant was employed as a painter at that job site during March 1977.

Dr. Joseph A. Jachimczyk, Chief Medical Examiner for Harris County, performed an autopsy on Ramona Abner at 10:00 a.m. on March 25, 1977. He determined that "the cause of death was from the cuts and stabs in the neck, chest, back, and upper extremities. Basically, she bled to death from the cuts, especially the neck wound." Dr. Jachimczyk testified that the cuts were made by a cutting instrument such as a knife and that "there was partial decapitation inasmuch as the cuts went down to the cervical vertebra itself; ... that is, the muscles that holds (sic) the vertebra together."

---

3. On cross-examination Sandra explained that under "special conditions" appellant had been authorized to pick Ramona up from school. She testified that "if he [appellant] was using my car and if it looked like it would be raining, I'd ask him if he was out when it was time for her to get out of school, if he would pick her up." However, Sandra also stated that March 24 had been "sunshiny," and that she had not asked appellant to pick Ramona up from school that day.

"Q. Would these three, possibly five, and at least three deep wounds be consistent with and explainable by someone placing a knife to someone's neck and having that person twist away?

"A. I don't think so, no, sir.

"Q. Were those the type of wounds that someone could encounter or suffer just by holding the knife at someone's neck and having that person just twist away once?

"A. Well, one of them could, but not the other two. In other words, there were three deep separate wounds.

"Q. So, if someone encountered one of those cuts by one twisting away, there would have had to have been at least two more and possibly four more?

"A. Two more, possibly three more for a total of five."

Dr. Jachimczyk also concluded that Ramona had been forcibly raped before she died.

According to the doctor's testimony, there was "fixed rigor mortis" when the autopsy began at 10:00 a.m. and this stage of rigor mortis was consistent with death occurring at approximately 3:30 p.m. the day before. On cross-examination Dr. Jachimczyk also stated that the condition of the body would be consistent with death occurring at approximately 5:30 p.m. or as late as 9:30 p.m. on March 24.

At this point the State rested and the defense called its only witness. William L. Bond, a retired investigator for the Medical Examiner's Office, testified that he arrived at the construction site where Ramona was found at 5:20 a.m. on March 25. Around 6:00 a.m. Bond helped place Ramona on a stretcher and stated that her limbs were still movable to some extent. After eliciting Bond's testimony the defense rested and both sides closed.

Points of error ten and eleven separately contend that the trial court committed error by admitting into evidence a letter written by appellant to his wife, thus violating Articles 38.11 and 38.22, V.A.C.C.P. In pretrial motions appellant argued that the letter was not admissible, because it was a privileged communication between husband and wife. Trial briefs were submitted to the court by both sides on this privileged communication issue.

On July 23, 1979, a pretrial hearing was conducted in which Viola Cobb, appellant's mother-in-law, testified that after appellant was arrested her daughter, Sherry Zimmerman, returned to Indiana in June 1977. Cobb stated that she had read various letters written by appellant to Sherry without obtaining Sherry's permission or consent. Cobb also testified that the letters were kept in a dresser drawer and that she would read them after Sherry went to work. Cobb identified four letters written by appellant, and stated that she (Cobb) had sent them to her other daughter, Sandra Abner, in Houston.

On cross-examination it was revealed that Cobb had not secured Sherry's permission to send the letters to Houston and in fact sent the letters expecting them to be turned over to the police.

"Q. What was your purpose in sending the letters to Mr. and Mrs. Abner?

"A. I didn't know any other address down here to send the letters to the authorities. That's why I mailed them to my daughter.

"Q. In other words, you wanted these letters to come into the possession of the authorities, I assume by that you mean the police department or the District Attorney's office?

"A. *Very, very much.*"

Cobb specifically referred to State's Exhibit # 2 as being a letter in which appellant "was telling Sherry that he did murder Ramona." Cobb admitted that she was looking for evidence that appellant had committed a crime, but that she never discussed the contents of the letters with Sherry.

At the conclusion of the hearing the trial judge ruled the letters admissible. Prior to trial appellant again filed a motion objecting to the admissibility of the letters and reoffering the evidence presented at the pretrial hearing on this matter. The motion was overruled as well, and the trial

court granted appellant "a running objection and the same ruling at each and every time that these [letters] be brought up during the course of the trial, whether it be guilt or innocence or, if we get there, punishment."

At trial the prosecutor was allowed to read one of the letters as edited (State's Exhibit # 2–B) into evidence over defense counsel's renewed objection. The edited letter was read to the jury. The long, rambling letter related to appellant's past marital history, and past difficulties but included:

"Back of page 5: 'asked me if she was still going to live with me and you. I told her no because you wouldn't like what she wants to do. She then told me she thinks she likes what happened and was going to tell her mommy. I told her no but she started running off her mouth about this and that. I said to myself that she was like all the other women just use men. I got the knife out of the truck and put it to her neck. She twisted away and when I saw blood I went in shock and really went out of it. That's all I remember. I don't even remember when or how I got home. All I know is that I was in the house and you were in the bed instead of on the couch.' "

At the time of trial former Article 38.11,[4] supra, titled "Husband or wife as witness," was in effect and read as follows:

"Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal

prosecution. However, a wife or husband may voluntarily testify against each other in any case for an offense involving any grade of assault or violence committed by one against the other or against any child of either under 16 years of age, or in any case where either is charged with incest of a child or either, or in any case where either is charged with bigamy, or in any case where either is charged with interference with child custody, or in any case where either is charged with nonsupport of his or her spouse or minor child."

This Court recently noted that Article 38.11, supra, as enacted in 1965 and as amended in 1973, provided a privilege as to confidential communication and a disqualification as to the adverse testimony of the spouse that remained absolute. *Willard v. State*, 719 S.W.2d 595, 598, 599 (Tex.Cr. App.1986); see also 3 L. Simkins, *Texas Family Law with Forms*, § 33.2 at 656–58 (Speer's 5th Ed.1976); *Bruni v. State*, 669 S.W.2d 829, 833–34 (Tex.App.–Austin 1984).

"This is a two pronged privilege. A person, though no longer married, may not testify as to confidential communications made by his spouse during the marriage. The second part of the privilege is that neither a husband nor a wife may be a witness against his spouse during the existence of the marriage whether or not the subject of the testimony is a confidential communication. This absolute disqualification dissolves upon dissolution of the marriage but the ban on testifying about communications remains." *Lackey v. State*, 638 S.W.2d 439, 443 (Tex.Cr.App.1982).

This Court has further held that the disqualification of a spouse as an adverse witness may not be waived, and that it is reversible error for the State to call a defendant's wife to the stand, thereby forcing the defendant to object in the presence of the jury. *Johnigan v. State*, 482 S.W.2d 209, 210–11 (Tex.Cr.App.1972); see also *Stewart v. State*, 587 S.W.2d 148, 153 (Tex. Cr.App.1979); *Wall v. State*, 417 S.W.2d 59, 63 (Tex.Cr.App.1967); *Bruni*, supra, at

4. Now see Rule 504, Tex.R.Crim.Ev. (effective September 1, 1986).

834. "That spousal disqualification cannot be waived where the State calls the spouse of an accused simply means no contemporaneous objection is required to preserve error for appeal." *Aguilar v. State*, 715 S.W.2d 645, 649 (Tex.Cr.App.1986).

There are, however, recognized exceptions to the rule that communications between spouses are absolutely privileged. One such exception involves statements between husband and wife which are overheard by third persons and do not come within the privilege of Article 38.11, supra. *Bear v. State*, 612 S.W.2d 931, 932 (Tex.Cr. App.1981); *Gibson v. State*, 516 S.W.2d 406 (Tex.Cr.App.1974); *Stallings v. State*, 476 S.W.2d 679 (Tex.Cr.App.1972); *Matlock v. State*, 373 S.W.2d 237 (Tex.Cr.App.1963); *Leal v. State*, 711 S.W.2d 702, 715 (Tex. App.-Corpus Christi 1986, PDR granted); *Lowe v. State*, 676 S.W.2d 658, 661 (Tex. App.-Houston [1st] 1984, PDR ref'd); *Wolf v. State*, 674 S.W.2d 831, 842 (Tex.App.- Corpus Christi 1984, PDR ref'd). "Such communications witnessed by a third party simply lose their confidential character." *Bear*, supra, at 932; *Harwell v. State*, 156 Tex.Cr.R. 337, 242 S.W.2d 388 (1951); see also McKnight, *Family Law: Husband and Wife*, 36 Sw.L.J. 97, 1010 (April 1982) ("A spouse may testify, however, as to communications made between the spouses during marriage if a third person was present during the conversation, because those statements are not privileged statements under article 38.11.")

At least one noted authority has analogized confidential communications overheard by a third party to written communications obtained by a third person.

"Third persons who overhear confidential communications between husband and wife are competent to testify to them. However, as to written communications which reach the hands of third persons it is believed that a distinction should be made. If the documents are voluntarily delivered by the addressee, the privilege should remain in favor of the other spouse. Otherwise as stated by Professor Wigmore,[5] 'the privilege could by collusion, be practically nullified for written communications.' This rule has been adopted by the Court of Criminal Appeals. Where, however, the document comes into the possession of the third person without the consent of the addressee, the privilege should cease just as it does where a conversation is overheard." Ray, *Texas Law of Evidence*, § 438, ch. 7, pp. 427–28 (1980).

The rule Professor Ray refers to as having "been adopted by the Court of Criminal Appeals," is found in *Walker v. State*, 64 Tex.Cr.R. 70, 141 S.W. 243 (1911). In *Walker* the defendant wrote a letter to his "alleged former wife," who promptly delivered the letter to her father to be brought to Texas. He in turn relinquished the letter to the authorities "for the purpose of being used as evidence against this defendant in this cause." *Walker*, supra, 141 S.W. at 244. The letter was admitted over defense counsel's objection. This Court held that "letters written to the wife of the person on trial are held to be inadmissible in evidence against him, and especially is

---

**5.** According to Professor Wigmore the following distinction should be made:

"For documents of communication coming into the *possession of a third person*, a distinction should obtain, ... That is, if they were obtained from the addressee spouse by voluntary delivery, they should still be privileged (for otherwise the privilege could by collusion be practically nullified for written communications); but if they were obtained surreptitiously or otherwise without the addressee's consent, the privilege should cease." 8 Wigmore, Evidence, § 2339 (McNaughton rev. 1961). (Emphasis in original.)

Cf. *United States v. Neal*, 532 F.Supp. 942 (D.Colo.1982) (Defendant's wife surreptitiously permitted government agents to listen to her three telephone conversations with her husband. Such connivance undermined the mutual trust of the marital relationship and subverted the intention of the rule of privileged communication. No government agent was allowed to testify regarding the content of the interspousal conversations.); *People v. Dubanowski*, 75 Ill.App.3d 809, 31 Ill.Dec. 403, 394 N.E.2d 605 (1979) (Police officers precluded from testifying about a conversation had between defendant and his wife, where wife *agreed* to wear listening device and conversation took place while the two were legally married.)

this true where the wife furnishes the letter to be thus used." *Walker,* supra, at 244.

The holding in *Walker* was based on the decision in *Gross v. State,* 61 Tex.Cr.R. 176, 135 S.W. 373 (1911), decided the same year. *Gross* also involved a letter written by the defendant to his wife, but surreptitiously read by the wife's mother. Although the letter was burned by the wife, the mother was allowed to testify, over objection, to its contents. The trial court reasoned that since the wife did not "aid" in getting the letter to her mother, the communication should be treated as one overheard by a third person. This court overturned the trial court's ruling:

> "There is a broad distinction between the introduction of conversations overheard by third parties occurring between husband and wife and the introduction of letters written by one to the other, as shown by practically, if not all, the authorities. It is unnecessary to take up or discuss the question as to conversations going on between husband and wife which are overheard by other parties. That question is not in the case, and it is unnecessary to discuss it. We hold that the letter through the witness Mrs. Maud Coleman [the mother] was inadmissible. It was a privileged communication under the statute, and therefore interdicted." *Gross,* supra, 135 S.W. at 376.

Two years later the same Court that decided *Walker* and *Gross* introduced *Harris v. State,* 72 Tex.Cr.R. 117, 161 S.W. 125 (1913), into this state's jurisprudence. In *Harris,* this Court reversed its prior stance and noted: "Letters stand in the same category as third persons overhearing conver-

sations between the husband and wife." *Harris,* supra, 161 S.W. at 128. Consequently, it was held that if it could be shown in another trial that the wife's mother "got possession of the letters without the knowledge, connivance, or acquiescence of either the husband or wife, and she knows the handwriting and can so state, then she can so testify, but as to the contents of the letters she would not be permitted to testify, unless it was further shown that such letters had been lost or destroyed." *Harris,* supra, at 128. This Court made a special point to emphasize that if the wife's mother had obtained the letters with her daughter's knowledge and consent to enable the mother to testify, she should not be permitted to testify about the letters.

■ Appellant argues that *Harris* should not be the standard adopted by this Court, but rather urges us to follow *Gross.* "Appellant asserts that the established rule in Texas deems it irrelevant whether the wife connived, cooperated or knew of the State's getting the evidence, that the letter is privileged and remains so, that it cannot be defeated by acts of thievery or even mere happenstance."[6] However, we feel the more applicable rule is the one enunciated in a Kansas Supreme Court opinion which holds "that where a written confidential communication between husband and wife falls into the hands of a third party inadvertently and without the consent or connivance of the addressee-spouse, the third party should be permitted to testify as to the communication." *State v. Myers,* 230 Kan. 697, 640 P.2d 1245, 1248 (1982).[7] In *Myers* it was stressed that

---

**6.** It is important to note that Rule 504(1)(b), Tex.R.Crim.Ev. (effective September 1, 1986), now permits a person claiming the marital privilege "to prevent another from disclosing a confidential communication made to his spouse while they were married." A communication is considered confidential under Rule 504(1)(a) "if it is made privately by any person to his spouse and it is not intended for disclosure to any other person." Rule 504, of course, was not in effect at the time of trial.

**7.** For other cases holding that the marital privilege does not apply to written communication

in the hands of third parties see *Dickerson v. United States,* 65 F.2d 824 (D.C.Cir.1933), *cert. denied,* 290 U.S. 665, 54 S.Ct. 89, 78 L.Ed. 575 (1933) (Letter normally considered a privileged confidential communication between a husband and wife lost its privileged character and was admissible as evidence after coming into the hands of the prosecution through a third party.); *People v. Peak,* 66 Cal.App.2d 894, 153 P.2d 464 (1944) (Third person who obtained a letter without the connivance of a spouse could testify as to its contents. Court analogized a written communication between husband and wife falling into the hands of a third party as being similar

all relevant facts should be available to the court so that the truth may be ascertained, although exceptions to this general rule must be recognized where privileges are created by statute. The Kansas Supreme Court also noted that applying such a rule to written communications is "entirely consistent" with the almost universally accepted rule that oral statements of one spouse to another are admissible when overheard by a third person even without the knowledge or consent of the spouses. It was concluded that "the marital privilege is to protect the *confidential relationship* between husband and wife." *Myers*, supra, 640 P.2d at 1249. (Emphasis in original.)

■ In the instant case Viola Cobb testified that she obtained the letters written by appellant *without* her daughter's consent and that she sent the letters to Houston without ever informing her daughter that she intended to have the letters turned over to the authorities. Clearly, this situation falls under the category of cases represented by *Myers*, supra. Furthermore, it is obvious that appellant did not intend his letter to be a private communication. Toward the end appellant wrote:

> "Don't hide this letter because the lawyers and doctors are going to know it all. I'm going to tell them everything."

Similarly, in *Grulkey v. United States*, 394 F.2d 244 (8th Cir.1968), a communication to the defendant's wife was not intended to be confidential where the husband knew that his wife had difficulty reading and anticipated that a third person would read the letter to her. See and cf. *State v. Heistand*, 708 S.W.2d 125, 126 (Mo.1986) (Defendant did not intend for his wife to preserve the information communicated in confidence, since his letter requested her to enlist the aid of a third person to help cover up his crime.); *State v. Smyth*, 7 Wash.

App. 50, 499 P.2d 63 (1972) (Since defendant knew all outgoing mail from the jail was read before being sent out, his letter was not intended to be, nor could it be, a confidential communication.); *United States v. McCown*, 711 F.2d 1441 (9th Cir. 1983) (Defendant's request that his wife write a check to purchase a firearm not intended to be kept confidential.); *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954) (Communication made to or in the presence of third parties was not intended to be kept confidential.) Based on the forgoing authorities we find that the letter written by appellant to his wife and obtained by appellant's mother-in-law without the aid and consent of appellant's wife was properly admitted into evidence at trial. This point of error is overruled.

In his eleventh point of error appellant argues that since the letter in question was written to his wife while he was in jail and in custody it should not have been admissible under Article 38.22, supra, in effect at the time the letter was written. (Acts 1967, 60th Leg., ch. 659, p. 1732, 1740, 1741, § 23, eff. Aug. 28, 1967.)

Appellant's letter, which was introduced, was written on July 9, 1977, and was postmarked July 11, 1977. The 1977 version of Article 38.22, supra, went into effect on August 29, 1977. (Acts 1977, 65th Leg., ch. 348, p. 935, § 2, eff. Aug. 29, 1977.) It was this version of the statute that was in effect at the time of appellant's trial.

The State calls attention to § 5 of Article 38.22, supra, as amended in 1977, that "Nothing in this article precludes the admission ... of a statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused

to a conversation between spouses being overheard by a third party.); *State v. Wilkins*, 72 Or. 77, 142 P. 589 (1914) (Court stated that the statutes directed against the examination of either spouse as a *witness* were distinguishable from the admission of communications between the spouses as derived from independent sources. It was determined that written communications produced by third parties, even if

secured surreptitiously, are admissible into evidence and the court would not concern itself with how possession of them was acquired.); see also Annot. 32 A.L.R. 4th 1177; cf. Annot., 3 A.L.R. 4th 1104, at 1111 (Citing cases supporting the view that betrayal or connivance by the addressee spouse *extends the privilege* for confidential marital communications.)

as a witness, or of any other statement that may be admissible under the law."

And it is noted that under the 1977 statute that a letter written by an accused while in custody but not as a result of custodial interrogation is admissible. *Hightower v. State*, 629 S.W.2d 920, 925 (Tex.Cr.App.1981). See also *East v. State*, 702 S.W.2d 606, 614 (Tex.Cr.App.1985) (oral statement made while the accused was in custody, but not pursuant to any type of interrogation, ruled admissible under Article 38.22, § 5, supra).

■ The State recognizes that the 1977 amendment represented a major change in the law of confessions and statements. It argues, however, that the 1977 version of the statute was a procedural change and that it is generally recognized that procedural statutes control litigation from their effective dates and apply to both pending and future actions. *Wade v. State*, 572 S.W.2d 533 (Tex.Cr.App.1978); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976); *Wilson v. State*, 473 S.W.2d 532 (Tex.Cr.App.1971); *Miller v. State*, 468 S.W.2d 818 (Tex.Cr.App.1971) (amendment of statutes governing admissibility of confessions applied to pending cases); *Ritchey v. State*, 407 S.W.2d 506 (Tex.Cr.App.1966); *Sinclair v. State*, 261 S.W.2d 167 (Tex.Cr.App.1952). See also *Harper v. State*, 686 S.W.2d 738 (Tex.Cr.App.1985); *Alvarado v. State*, 723 S.W.2d 318, 319 (Tex.App.–Austin 1987). And it argued that the application of the 1977 statutory version to the instant case would not be an application of an ex post facto law under the definition set forth in *Betancourt v. State*, 590 S.W.2d 487, 488 (Tex.Cr.App.1979), *cert. den.*, 446 U.S. 942, 100 S.Ct. 2166, 64 L.Ed.2d 796. See also *Flores v. State*, 727 S.W.2d 691, 692–693 (Tex.App.–San Antonio 1987).

However, unlike many procedural statutes § 3 of the 1977 amendatory act provided:

"This Act applies only to statements made on or after the effective date."

In view of this provision it is clear that the 1967 amendment to Article 38.22, supra, in effect at the time of appellant's letter to his wife controls, not the 1977 version.

The admission in evidence of a "confession" of one accused of a crime has always been controlled by statute in this state. *Pierson v. State*, 168 S.W.2d 256 (Tex.Cr.App.1943). In *Pierson*, quoted in *Butler v. State*, 493 S.W.2d 190, 191–92 (Tex.Cr.App.1973), the history of our statutes was set out.

The statutes relating to confessions for many years were not confined strictly to a technical confession but covered any act in the nature of a confession, statement or circumstances done or made by a defendant while in confinement or custody, which could not be used by the prosecution as a criminative fact against the defendant, unless he was properly warned and the "confession" was otherwise admissible under the statute. See 1 Branch's Ann.P.C., 2nd Ed., § 82, p. 79.

As noted in *Butler*, supra, the Legislature in adopting the statute relating to circumstances under which a "voluntary confession" made in jail or custody could be used made a statutory determination that proof an extrajudicial "confession" or statement, etc., made while in jail or custody are generally unreliable.

In *Easley v. State*, 493 S.W.2d 199, 200 (Tex.Cr.App.1973), it was stated:

"We adhere to a high standard in holding that admissions of an accused made while in custody *must* satisfy the rule as to confessions in order to be admissible. *Garner v. State*, 464 S.W.2d 111 (Tex.Cr.App.1971). This Court, in construing our confession statutes, has further excluded any act tantamount to or in the nature of a confession and any unwarned statement even though it lacks the essential elements of a confession. *Garner v. State*, supra." (Empahsis in original.)

In *Easley*, the admission in evidence of testimony of three jail inmates who attributed to the incarcerated defendant certain statements in nature of oral confessions constituted reversible error.

In *Pierson*, supra, it was noted that a letter written in jail by the defendant would be covered by the same rules as

those applicable to oral confessions under Article 727, V.A.C.C.P., 1925, then in effect. *Pierson* had also involved the use of the defendant's oral statements before the grand jury to impeach his trial testimony when such grand jury statements were made after he was charged with murder, confined in jail, and was carried before the grand jury. Such impeachment was held improper.

In *Bratton v. State,* 102 Tex.Cr.R. 181, 277 S.W. 387 (1925), it was held that an incriminating telegram sent by the defendant to his wife while he was in custody may not be used as direct evidence or for impeachment purposes.

In *Nolen v. State,* 14 Tex.App. 474 (Court of Appeals 1883), it was held to be error to prove in a murder case, over defense objection, that two or three days after defendant's arrest, he was taken in custody to the scene of the homicide, and asked what he had done with the body of the deceased, and that in reply he had pointed to a hill where the body had been previously found.

In *Butler,* supra, the defendant claimed in his testimony that he shot the deceased while pursuing him after the deceased and two others had robbed him (defendant). On cross-examination he denied the deceased had called his wife names, etc., or that he had ever seen the deceased before the occasion in question. The State's theory based on Butler's statements at the scene of the homicide was that the deceased had called Butler's wife names, had been giving her "a hard time," etc.

In rebuttal the State called a police officer who testified that while Butler was in custody at the police station some three hours after his arrest he (the officer) overheard a conversation between Butler and his wife about a previous night when "somebody in a white model car" drove up and called his wife "an old bitch." The officer's testimony was used to contradict and impeach Butler's testimony and to corroborate the State's theory of the case.

The use of such testimony for impeachment was held improper in light of the legislative determination in Article 38.22, then in effect. The history of the confession statutes was traced at some length. It was the *Butler* opinion which triggered the 1977 amendments to Article 38.22, supra.

In *Chambliss v. State,* 647 S.W.2d 257, 261 (Tex.Cr.App.1983), this Court discussed the differences between the former and the amended versions of Articles 38.22, supra, as follows:

"Until 1977, Article 38.22 applied to confessions made while 'the defendant was in jail or other place of confinement or in the custody of an officer ...' Article 38.22, V.A.C.C.P. (Vernon 1966). As can be seen, this language omits any requirement that the statement stem from 'interrogation.' By contrast, after Article 38.22 was amended in 1977, the old language was changed so that 'custody' itself would not invoke the protections of the statute: Section 3(a) spoke of an 'oral statement of an accused made *as a result of custodial interrogation,*' and Section 5 created new exceptions for a statement that did not 'stem from *custodial interrogation*' or a *'voluntary statement, whether the result of custodial interrogation or not,*' that had a 'bearing upon the credibility of the accused as a witness.'" (Footnote omitted) (Emphasis in original)

█ While it appears the letter in the instant case would have been admissible under the 1977 amendment to Article 38.22, supra, we are bound by the legislative mandate that such legislation shall apply only to statements made after August 29, 1977, the effective date of the 1977 amendment. The letter in question had been written prior to the time. Thus, the prior statute and case law of long standing are applicable. The letter was not admissible, and the court erred in admitting the same over proper objection. It is here noted that prior to the introduction of the letter in question the trial court had granted the appellant "a running objection" on the basis of Article 38.22, supra, with respect to the admission of the letter into evidence "whether it be guilt or innocence or, if we

get there, punishment." Accordingly, we sustain appellant's eleventh point of error.

We now skip to appellant's thirteenth point of error, in which he alleges that the trial court erred in permitting the introduction of unsubstantiated extraneous acts of misconduct at the penalty stage of the trial. This point of error also refers to the letter appellant wrote to his wife while in custody. On punishment the edited portions of the letter, which were not presented to the jury during the guilt-innocence phase, were included and revealed several unadjudicated acts of misconduct by appellant such as starting fires as a child, brutality to animals, rapes and beatings of adult women, rapes of children 12 and 13 years old, kidnapping, use of guns and knives, beating of spouse, and a stabbing while appellant was in prison. Appellant objected to the admission of these portions of the letter (State's Exhibit # 2–C) on the following grounds:

"The State is obviously offering this document as evidence of the truth of the matters asserted therein. All of the matters that I have referred to and pointed and directed the Court's attention to are extraneous crimes. And unless and until the State is prepared to offer some evidence in corroboration of those statements, we would object to them as lacking any indicia of reliability, in particular that indicia of reliability, the death penalty phase of trial. And, admission of these in evidence will deny the Defendant due process of law under the Sixth, Fifth, and Fourteenth Amendments of the Constitution of the United States under Article I, Section 19 of the Texas Constitution."

Without abandoning points of error ten and eleven, appellant argues that "the letter was inadmissible as competent punishment evidence due to its utter lack of substantiation."

Although the trial court at the penalty stage of a capital murder trial has wide discretion in admitting or excluding evidence, such discretion extends only to the question of relevance of the facts sought to be proved. *Beltran v. State*, 728 S.W.2d 382, 387 (Tex.Cr.App.1987).

"It is true that the trial court at the punishment phase of a capital murder trial has wide discretion in admitting or excluding evidence. (Citations omitted) However, this discretion extends only to the question of the *relevance* of the facts sought to be proved. Article 37.071(a), supra, does not alter the rules of evidence insofar as the *manner* of proof is concerned." *Porter v. State*, 578 S.W.2d 742, 748 (Tex.Cr.App.1979), *cert. denied*, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982) (Emphasis in original); see also *Beltran*, supra, at 387; *Smith v. State*, 683 S.W.2d 393, 405–06 ([Tex.Cr.App.] 1984).

This Court concluded, in *Porter*, that "[w]hile the facts contained in the document in question may have been relevant to punishment," the manner in which the State sought to prove those facts denied the defendant his constitutional rights. *Porter*, supra, at 748.

*Rumbaugh v. State*, 589 S.W.2d 414 (Tex.Cr.App.1979), involved an analogous situation in which a tape recorded statement was admitted into evidence during the penalty stage of trial. The defendant objected that the tape recording was inadmissible under Article 38.22, V.A.C.C.P. We held "that the statutory rule of evidence that excludes oral confessions made in custody does apply to the punishment phase of a capital trial, ..." *Rumbaugh*, supra, at 419. It has since been noted that the holding in *Rumbaugh* "recognized that certain exclusionary rules of evidence do apply at the punishment phase of a capital trial, in interpreting the meaning of Article 37.071." *O'Bryan v. State*, 591 S.W.2d 464, 475 (Tex.Cr.App.1979) [citing *Porter*, supra, and *Cortez v. State*, 571 S.W.2d 308 (Tex.Cir.App.1978)].

Finally, this Court has also established that there is no conflict between our holding that the exclusionary rules of evidence apply during the penalty phase and our previous holding that evidence of unadjudicated, extraneous offenses is admissible at the penalty phase of a capital murder trial.

*Beltran,* supra, at 387; *Rumbaugh,* supra, at 418.

Having previously ruled that the edited letter introduced at the guilt-innocence phase of trial was in violation of Article 38.22, supra, then in effect and therefore inadmissible, we now hold that the trial court also erred in admitting the entire letter into evidence at the penalty stage of trial. Appellant's thirteenth point of error is also sustained.

Appellant's twelfth point of error alleges that his second trial should have been barred by the double jeopardy clause of Article I, § 14 of the Texas Constitution, as well as the Fifth Amendment of the United States Constitution.

Appellant argues that the "deliberate and prejudicial misconduct" of the prosecutor at the first trial in using his extrajudicial confession when he knew the statement had been obtained by police brutality triggered the preclusive effect of the double jeopardy clauses. He acknowledges that no motion for a mistrial was provoked by the prosecutor, but a new trial on his own motion was granted. He contends the trial court erred in overruling his pretrial plea of jeopardy at the second trial after a hearing.

At such jeopardy hearing several witnesses testified and a portion of the record from the first trial and the statement of facts from the hearing on the motion for new trial was admitted into evidence.

Prior to the first trial a *Jackson v. Denno*[8] hearing was held to determine the voluntariness and admissibility of appellant's confessions. See also Article 38.22, V.A.C.C.P. Jacinto City Officer Wayne Speaks testified he arrested appellant in the early evening of March 24, 1977, at the home of his sister-in-law, the deceased's mother. Speaks gave appellant his *Mi-*

*randa*[9] and blue card warnings at the time of his arrest.

A magistrate related he gave the statutory warnings to the appellant after his arrest (on a kidnapping charge) on March 24th, which was prior to any oral confession, and gave such warnings again to the appellant on the morning of March 25, 1977) in connection with a murder charge. This latter action was prior to the written confession.

Jacinto City Detective Chastain investigated the case and testified he gave the appellant his *Miranda* warnings, that appellant had not been forced in any way to help in the investigation. Chastain related that appellant led the officers to two different construction sites in search of the body. The first trip was unsuccessful. On the second trip the body was found, and later a knife was found where appellant said he had thrown it.

Lawrence Scroggins, an attorney, who was once Jacinto City Municipal Court Judge, was present during the early interrogation of the appellant. He accompanied the police and appellant to both construction sites.[10] He felt that the oral statements of appellant were voluntary. After the finding of the body, Scroggins left to go to work about 5 a.m. He was not present when the written confession was given later in the morning.

Zelle Kennedy, a municipal court clerk, testified the appellant told her that he had read the written statement and understood it. She stated that appellant signed the statement voluntarily and she notarized it.

Houston Police Officer Don Langston witnessed the written confession being taken and felt that it was voluntarily given.

San Jacinto Police Chief Allen[11] Jamail testified that the appellant had voluntarily

---

8. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. Scroggins related after the return to the police station from the first construction site, he observed appellant being hit by another suspect following an argument. Appellant had earlier

named this suspect and another man as being involved. The two men had been contacted and had arrived at the police station during the trip to the first construction site.

11. In the record the Chief's given name is sometimes spelled "Allan."

shown the police the site where the body of the deceased was found, that appellant had gotten into a fight with another suspect at the jail, and that he had given the *Miranda* warnings to the appellant before he voluntarily had given the written confession. He had heard of confessions obtained by abuse, but had never observed such an event, and that appellant had not been forced to make his confession. Jamail related he had taped the interview with the appellant and the tape was offered into "the court's custody."

Appellant testified at the *Jackson v. Denno* hearing conducted pursuant to his motion to suppress. He related that when arrested he was struck several times with a flashlight, that at the jail he had been slapped and hit, that Jamail and other officers had used a cattle prod on him. The instrument, later described as a shock baton, was first applied, according to appellant, to his chin and chest, then later to his nipples and once to his private parts at which time he began screaming. He stated his wife was at the police station part of the time and that Jamail threatened to put her through "hell and misery" and to continue to beat him unless he confessed. For these reasons he stated he confessed. Appellant's counsel, Fred Dailey, testified that attorney Scroggins had stated to him that appellant was insane in Scroggins' opinion. Chief Jamail was recalled for further cross-examination at the hearing. On redirect examination he testified he was with appellant after he arrived at the station until the confession was given except for about 30 minutes. He testified that no one beat appellant or used a cattle prod or shock baton on him, and he did not threaten appellant or threaten to hurt or harm appellant's wife. He denied appellant's chin was burned or disfigured. In general, he rebutted appellant's testimony.

It appears from the record that tapes of the interview mentioned earlier were made available to appellant's trial counsel and the court. After the hearing the court found the confession admissible. The issue of voluntariness was not raised before the

jury. The defense at the first trial was insanity.

At the hearing on the motion for new trial, Majorie Tomek [12] testified that on the night of March 24, 1977, she was a Jacinto City police dispatcher. About 11:30 p.m. on that date she saw appellant coming through an inside door, and observed that Sgt. Bonds had him by the hair and was striking him across the shoulders with a slapjack. She thought at first appellant was trying to escape and asked a bystander to stop appellant, but later she realized she was mistaken. She also testified she typed appellant's written confession the next morning, and recalled that Chief Jamail told appellant what to say for the purpose of the confession. After she was discharged in July 1977, Tomek went to see Henry Oncken, assistant district attorney, and told him of some activities at the Jacinto City Police Department, but she did not mention appellant's confession or his case. Later she did testify before a federal grand jury.

James T. Schmidt, a reserve police officer for the Jacinto City came to the police station about 10:30 p.m. on March 24, 1977. He was told by Dispatcher Tomek not to go into the station proper. He heard someone screaming "Leave me alone," "You pigs" and "I'm not going to tell you anything." Upon inquiry as to what was happening, Tomek told him "Don't say nothing to nobody." Schmidt went home. He did not know who was screaming. He did not bring this matter to the attention of the district attorney's office until some months after appellant's trial.

Jacinto City Police Officer Glen Brown testified that around midnight or the early morning hours of March 25th he heard hollering, screaming and loud talking at the police station. He did not know who was making the noise. Later, after he had been on patrol, he saw Chief Jamail, Officers Bonds and Chastain with the appellant in a hallway. He also saw Jamail, Bonds and the appellant in a restroom with what appeared to be a shock stick. He did not see appellant mistreated, hit, manhandled

12. Elsewhere in the record the name is some-   times spelled "Tomac."

or slapped by the officers. He was not subpoenaed for the first trial and did not relay any information to the district attorney's office.

Jacinto City Officer B.E. Chastain[13] testified at the hearing on the motion for new trial that after the finding of the body of the deceased at the second construction site to which they had been directed by appellant, he returned to the station in a car with Chief Jamail, Officer Bonds and the appellant. He remembered that as they were leaving the scene Bonds stated to appellant "You've had it now" or "Your ass has had it ——. When I get you back to the station" or "something to that effect." Chastain, who testified as to the voluntariness of the confession prior to the first trial, could not recall whether he had volunteered this information about Bonds' statement to the district attorney's office or had mentioned it in his testimony. He recalled he later told a federal grand jury about the statement.

During the return trip to the police station apparently a tape of part of the conversation with appellant was taped by Jamail. Chastain recognized one of the voices as Jamail's. The tape, apparently secured by federal subpoena after appellant's first trial, was admitted into evidence at the hearing on the motion for new trial by agreement along with a transcription made by the federal district attorney's office. The transcription reflects that the tape in many parts was unintelligible. Other parts reflect an interrogation of the appellant about the facts of the crime. Other parts, however, reflect that after appellant pledged his cooperation, he inquired if there are going to be any more beatings and was assured by Jamail "... that's over with" and "Now, John, I tell you. There ain't going to be no beating of you or nothing and there ... and there wouldn't have been, but you know, we all knew you was lyin ... I'm glad you're getting it off your chest ... and the Good Lord's glad you are, you know ... How many times did you stab her in the back?"

Chief Allen Jamail, Officer Wayne Speaks and Andrew Torres all claimed the Fifth Amendment privilege against self-incrimination when called to testify at the hearing on the motion for new trial.

Robert J. Bodisch, an investigator with the Harris County District Attorney's office, testified he had been called to assist the Jacinto City Police Department and arrived there on March 24, 1977 about 11 p.m. He saw Chief Jamail pull the appellant's hair and slap him about the head, face and shoulders as appellant was being placed in a cell; that once inside the cell Jamail and Sgt. Bonds began to hit appellant both with open and closed fists, which blows appellant tried to ward off. That later appellant was dragged out of the cell while he was being slapped and punched by the officers. Bodisch attempted to step between the appellant and the officers, telling the officers they "were ruining their case, they're digging their own graves." Bodisch went with the officers to the first construction site in search of the deceased, but left for home after that unsuccessful endeavor. Bodisch revealed that prior to the hearing on the voluntariness of appellant's confessions he told assistant district attorney, Vic Driscoll, who prosecuted the case, about the assaults he had witnessed and had also mentioned the same to another assistant, Terry Wilson. Bodisch did not tell defense counsel what he had observed as it was his "work product."

Fred Dailey, one of appellant's counsel at his first trial, testified that prior to the *Jackson v. Denno* hearing at such trial he approached Bodisch, and asked him directly if he had seen appellant abused while he (Bodisch) had been at the Jacinto City Police Department, and that he answered in the negative, and indicated that "he had not seen anything to cause me (Dailey) to put him on the stand."

Lupe Salinas, assistant district attorney on March 25, 1977, testified he accepted murder charges against appellant on that date, that appellant was brought to the Intake Division about 11 a.m. by Chief Jamail, who was accompanied by Bodisch,

13. The officer's name is also spelled "Chastang" in the record.

who told Salinas he had gotten involved in the investigation. Salinas examined the confession and observed that appellant had no bruises or marks on his face or head or hands which were visible. He asked Bodisch if photographs had been taken of appellant to foreclose any involuntariness claim. Bodisch assured Salinas "that had been taken care of." Bodisch did not indicate to Salinas there was any question as to the voluntariness of the confession.

The record also reflects that in 1978 after the 1977 trial of appellant, Henry Oncken, Chief of the Special Crimes Bureau of the Harris County District Attorney's office, was in the course of an investigation into certain activities of the Jacinto City Police Department based on information received from officers or former employees of that department. Oncken received a report in March, 1978, from a "Jackie" Schmidt,[14] a former reserve officer with Jacinto City, that brutality by Jamail towards prisoners had occurred, and one prisoner mentioned was the appellant Zimmerman. In March, 1978, information gathered in the entire investigation of all the activities reported was sent to federal district attorney's office. At one time Oncken accompanied appellant's first trial counsel to the United States District Attorney's office in order that they might impart any information they had and to request the federal district attorney and the FBI to investigate the activities of the Jacinto City Police Department. This action resulted in federal indictments against Chief Jamail and others.

Oncken testified that on June 12, 1978, he had a meeting in his office with D.A. Investigator Bodisch, and that Bodisch told him at that time that he (Bodisch) had witnessed Chief Jamail and an officer "Brown" (later shown to be Sgt. Bonds) assault the appellant at the Jacinto city jail or police station. Oncken did not recall, and his memo made at the time did not

reveal, that Bodisch had stated that he (Bodisch) had told any other member of the Harris County District Attorney's office about the assault.

Vic Driscoll stoutly denied that Bodisch told him anything about the assaults upon the appellant or anything that bore upon the voluntariness of any confession. He recalled only that Bodisch told him why he (Bodisch) went to the Jacinto City police station, and that Bodisch related that when leaving for the first construction site that appellant attempted to escape or "stepped out too quickly," and that the officers grabbed appellant and pushed him against a wall and told him not to try to escape. Driscoll testified he did not call Bodisch as a witness at the *Jackson v. Denno* hearing because he was not present when the body was discovered or when the written confession was taken and was not a witness to anything that other witnesses would not cover. Driscoll stated he did not know of Bodisch's claim about having told him of the assaults until the conclusion of the federal investigation and after a taped conversation between Jamail, other officers and other officers were given to him by District Attorney Carol Vance.[15] In preparation for the hearing on the new trial motion, Driscoll related he talked to Bodisch and told him Bodisch would be a possible witness, and showed him the federal transcript of his testimony. Driscoll told Bodisch that his recollection of their earlier conversation was different, and that Bodisch had not given any additional information to him about the assaults. He related that Bodisch claimed the federal transcript was misleading and that Driscoll's name appeared only in the margin of the "notes" and on a different page, and that he only stated " 'Told Vic Driscoll' or something to that effect." Bodisch indicated to Driscoll that he had not told the federal grand jury that Driscoll was aware of the assault.

---

14. Apparently this was the same person as James T. Schmidt who testified at the hearing on the motion for new trial.

15. The tape apparently had been secured by federal subpoena from the Jacinto City Police Department and indicated that on the way to the police station after the finding of the body Chief Jamail had told the appellant the beatings would now be stopped.

Driscoll stated he had talked to a number of witnesses, most of whom testified at the *Jackson v. Denno* hearing at the first trial and he had been led to believe the confessions were voluntary.

Terry Wilson, chief prosecutor in another district court, only vaguely recalled appellant's case. He could not remember the time frame, but sometime before the federal investigation Bodisch had mentioned to him that Jamail or other officers had slapped appellant at the Jacinto City station, that Bodisch stated he had told Driscoll. Wilson did not recall talking to anyone about the matter until two weeks before his testimony at the hearing on the new trial motion.

At the conclusion of the hearing on the motion for new trial, the State joined in requesting that a new trial be granted on the basis of "newly discovered evidence." The motion for new trial was granted without comment. See Article 40.07, V.A.C. C.P.

At the hearing on the pretrial plea in jeopardy Majorie Tomek testified she had once seen Vic Driscoll in a grocery store. What relevancy this defense testimony served is not clear. Mary L. Sinderson, Assistant U.S. Attorney, testified she had a telephone conversation with Driscoll in October, 1978, that at the time she had never met him. She called to tell him that in her opinion the appellant's conviction would be vacated at some point, and to inquire what difficulties would be encountered in retrying the case. Driscoll, she stated, thought only an escape attempt had occurred, and that during the trial the "striking" had not been brought out by the defense.[16] Sinderson came to the conclusion that Driscoll had knowledge prior to trial because he had stated in the telephone conversation the defense had not raised the issue "and it was not brought out."

These were the only two witnesses offered at the pretrial jeopardy hearing. The other evidence was from hearings where the focus was not the same.

Appellant relies heavily upon Bodisch's testimony he told Driscoll prior to the first trial of the assaults he observed being made upon appellant. Driscoll denied this, claiming that he was told only of the escape attempt, and that all other witnesses assured him the confession had been voluntarily given. When charges were initially filed Bodisch was present and did not give any indication that there was any question of voluntariness of the confession. He told the defense counsel no abuse occurred in his presence. There is no showing that Bodisch claimed he had told Driscoll when he later talked to Oncken, who was investigating the Jacinto City police activities. When confronted by Driscoll with the testimony he had given to federal authorities he hedged, saying the transcript was being misinterpreted. Bodisch was not recalled for rebuttal.

It is principally these facts upon which appellant must rely to sustain his contentions.

The burden is on the defendant to go forth at his second trial with evidence in support of his allegation. *Wockenfuss v. State,* 521 S.W.2d 630 (Tex.Cr.App.1975); *Anderson v. State,* 635 S.W.2d 722, 725 (Tex.Cr.App.1982). A plea of former jeopardy constitutes nothing more than a pleading and does not establish the truth of the issues of fact alleged therein. *Anderson,* supra at 725.

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense. See *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); *Chvojka v. State,* 582 S.W.2d 828, 830 (Tex. Cr.App.1979). The same is true of Article I, § 14, of the Texas Constitution.

The general rule is that when circumstances which occasion a mistrial are not attributable to prosecutorial or judicial overreaching, a motion by the defendant

---

**16.** Appellant had not raised the issue of voluntariness of the confessions before the jury. He had personally testified at the *Jackson v. Denno* hearing as to police brutality.

for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecution or judicial error. *United States v. Dinitz*, supra; *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Chvojka v. State*, supra, at 830–831; *Crawford v. State*, 703 S.W.2d 655, 662 (Tex.Cr.App.1986). There is, of course, as noted, a prosecutorial overreaching exception to the general rule, and prosecutorial overreaching may indeed trigger the preclusive effects of the double jeopardy clause. See *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 2091, 72 L.Ed. 2d 416 (1982).

In *Kennedy*, supra, the Supreme Court held that "... the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.[17]

In the instant case appellant recognizes there was no mistrial motion made, but appellant argues that the nature of the prosecutorial misconduct (concealing knowledge that appellant was abused before "confession" and allowing witnesses to perjure themselves at hearing on voluntariness) was so egregious that it meets the recently-revised standard of *Oregon v. Kennedy*, supra, and *Anderson v. State*, 635 S.W.2d 722 (Tex.Cr.App.1982). Appellant claims the focus of the test is the intent of the prosecutor, and intent of the State here was to prevent his acquittal at his first trial. He argues that the fact that the alleged misconduct occurred before trial to prejudice his chances for acquittal, rather than during trial to provoke a mis-

trial, should make no difference under the above standard or test. Such conduct appellant contends triggered the preclusive effect of the double jeopardy provisions of both the federal and state constitutions.

In *Tenery v. State*, 680 S.W.2d 629 (Tex. App.-Corpus Christi 1984, PDR ref'd), a similar contention was advanced. In disposing of the contention Chief Justice Nye wrote:

"Whether the exception (i.e., intentional government overreaching) extends to situations where, as here, an earlier prosecution culminated in a jury verdict only to be set aside by an order of new trial is a matter of some doubt. The uncertainty arises from the established principle that 'the successful appeal of a judgment of conviction, *on any ground other than the insufficiency of the evidence to support the verdict*, poses no bar to further prosecution on the same charge.' *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *see Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *United States v. DiFrancesco*, 449 U.S. 117, 130–31, 101 S.Ct. 426, 433–34, 66 L.Ed.2d 328 (1980). Similarly, when the trial proceeds to its conclusion despite a legitimate claim of seriously prejudicial error, the Double Jeopardy Clause will present no obstacle to a retrial if the conviction is reversed on appeal. *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Durrough v. State*, 620 S.W.2d 134, 139 (Tex.Crim.App.1981).

"In the present case, the alleged prosecutorial misconduct did not result in a mistrial. Appellant complains of the fol-

---

**17.** The Court in *Robinson v. Wade*, 686 F.2d 298, 306 (5th Cir.1982), found that *Kennedy*, supra, had worked "significant modifications on the doctrine (of double jeopardy): the scope of its application was limited by a close identification of the nature of the conduct from which it could arise." After quoting as we have from *Kennedy* the Fifth Circuit panel wrote:

"In so defining prosecutorial overreaching, the *Kennedy* Court repudiated the broader implications of certain language in its earlier cases dealing with the prosecutorial over-

reaching exception which had led other courts to premise preclusion on lesser degrees of culpability in the prosecutor, or to focus on the severity of the prejudice worked to the fair right of the accused. Availability of the doctrine is now clearly conditioned, on a finding that the prosecutor intended to subvert the protections afforded by the Double Jeopardy Clause [by] 'goad[ing]' the defendant into moving for a mistrial, *Kennedy*, 102 S.Ct. at 2089."

lowing jury argument by the prosecutor ...

"Appellant contends on appeal that the granting of the new trial in appellant's case was attributable to prosecutorial overreaching. Specifically, appellant contends that the prosecutor's conduct at the first trial, through 'gross negligence or intentional misconduct,' caused aggravated circumstances to develop which seriously prejudiced the appellant. Therefore, appellant argues that, since a mistrial should have been declared by the trial court on its own at the first instances of misconduct, and the new trial was necessitated because of the trial errors, this was sufficient to trigger preclusion of retrial. We disagree.

"We hold that appellant's second trial for the same offense is not barred by virtue of the Double Jeopardy Clause of the Fifth Amendment or the related provision of the Texas Constitution. Appellant's first conviction was vacated when the trial court granted appellant's motion for a new trial. *See Alberts v. State*, 458 S.W.2d 83 (Tex.Crim.App.1970); *Mahavier v. State*, 644 S.W.2d 129, 134 (Tex. App.-San Antonio 1982, no pet.); *McGee v. State*, 629 S.W.2d 182, 184 (Tex.App.-Waco 1982, no pet.). Even assuming the narrow exception applied to this case, we cannot say on the facts here presented that the misconduct assigned by appellant constituted prosecutorial overreaching sufficient to bar appellant's retrial. *See Robinson v. Wade*, 686 F.2d at 309. There is no question but that the new trial came about as a result of prosecutorial error. However, the evidence clearly supports the trial court's finding of 'unintentional improper jury argument.' *See Anderson v. State*, 635 S.W. 2d 722 (Tex.Crim.App.1982); *Chvojka v. State*, 582 S.W.2d 828, 830–31 (Tex.Crim. App.1979). We hold that the trial court properly overruled appellant's plea of double jeopardy. Ground of error number one is overruled."

In *Robinson v. Wade*, supra, the Fifth Circuit panel observed that *"Kennedy's* consideration of the preclusive effects of prosecutorial overreaching, like all prior considerations of that doctrine consideration in the Supreme Court, occurred in a situation of the premature termination of the original proceeding." The panel then stated: "Whether the exception extends to situations where, as here, earlier prosecutions culminate in jury verdicts only to be set aside by reversal or orders of new trials is a matter of some doubt." *Robinson* at p. 306. The panel later concluded after discussion that a "definitive answer need not be given to resolve Robinsons's claim." *Robinson* at 309. The panel determined that under the facts presented there occurred no prosecutorial overruling to bar a retrial.

■ While *Tenery* is not on all fours factually with the instant case, we find it persuasive. In the instant case appellant's own motion for new trial was granted when the State joined such motion on the basis of newly discovered evidence. Even if double jeopardy clauses were applicable as well as the exception of prosecutorial overreaching, we cannot conclude from the circumstances and facts presented that the misconduct of the prosecutor assigned by appellant was sufficiently proven or was such as to constitute prosecutorial overreaching sufficient to bar appellant's retrial. The trial court did not err in overruling the plea of double jeopardy.

Appellant's final point of error contends that the trial court erred in overruling appellant's timely second motion to quash the indictment. Appellant's second motion to quash apprised the trial court that the indictment was insufficient, and sets forth in relevant part the following:

"II. The indictment is vague, uncertain, and fails to be or contain a plain, concise and definite written statement of the essential facts constituting the offense sought to be charged.

"III. The indictment does not adequately and fairly inform the Defendant of the offense or offenses sought to be charged against him.

"IV. The indictment does not set forth an offense with sufficient particularity to

enable Defendant to prepare his defense."

This motion was presented to the trial court prior to the commencement of trial, and was overruled.

The indictment in relevant part reads:

"JOHN CHARLES ZIMMERMAN JR. hereinafter referred to as the Defendant, heretofore on or about March 24, 1977, did then and there unlawfully while in the course of committing and attempting to commit kidnapping and Aggravated Rape, intentionally cause the death of Ramona Abner, hereafter styled the Complainant, by cutting her neck and stabbing her about her body with a knife."

Appellant claims the indictment is vague because it fails to include the name of the alleged kidnap victim.

We disagree. First of all, appellant's second motion to quash did not complain about the alleged failure to name the kidnap victim. Secondly, appellant did not orally raise this issue when the trial court made its ruling on said motion. "Absent an attempt to draw the trial court's attention specifically to the failure to name the victim of the underlying transaction, nothing is presented for review." *Russell v. State,* 665 S.W.2d 771, 777 (Tex.Cr.App. 1983); see also *Woolls v. State,* 665 S.W.2d 455, 456 (Tex.Cr.App.1983); *Kipperman v. State,* 626 S.W.2d 507, 512 (Tex.Cr.App. 1981).

In *Russell,* supra, the conviction was based on count one of the indictment drafted pursuant to V.T.C.A., Penal Code, § 19.03(a)(2), alleging that the defendant,

"... did then and there unlawfully, intentionally and knowingly cause the death of an individual, Hubert Otha Tobey, by beating and hitting him with a piece of concrete and by cutting and stabbing him with a knife; and the said Clifton Charles Russell a/k/a Clifton Charles Lacy did then and there intentionally cause the death of the said Hubert Otha Tobey in the course of committing the offense of robbery." *Russell,* supra, at 776–77.

We held that Russell's motion to quash the capital murder indictment had not claimed a failure to name the victim of the robbery, and also noted that the indictment did not suffer any jurisdictional defect for failing to allege the constituent elements of the underlying offense. Cf. *White v. State,* 543 S.W.2d 104, 106 (Tex.Cr.App.1976), *cert. denied,* 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d 384 (1977) (Grammatical error in the indictment did not mislead defendant or deny him fair notice of the offense with which he was charged.); *Jordan v. State,* 707 S.W.2d 641, 644 (Tex.Cr.App.1986); *Livingston v. State,* 542 S.W.2d 655, 658 (Tex.Cr.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977) (Ownership of property need not be alleged in a capital murder indictment which alleges the murder occurred during the course of a robbery); *Hogue v. State,* 711 S.W.2d 9, 14 (Tex.Cr.App.1986) (Failure to allege the manner in which the aggravating element of arson was alleged to have been committed was not detrimental to the indictment.); *Morin v. State,* 682 S.W.2d 265, 267 (Tex.Cr.App.1983) (Capital murder indictment was not fatally defective because it failed to allege all the elements of underlying robbery.). Because we find that *Russell,* supra, is on point with the instant case, we overrule appellant's fourteenth and final point of error.

Having sustained points of error eleven and thirteen, however, we must reverse and remand the instant cause.

CLINTON, J., concurs in the result.

WHITE, J., dissents.